831 So.2d 727 (2002)
CAULKINS INDIANTOWN CITRUS CO., a Florida corporation, Appellant,
v.
NEVINS FRUIT CO., INC.; Huff Groves; Lloyds Citrus; Vista PAcking Company; H Dearhardt Groves, Inc.; T Gardner Harvesting, Inc.; Hubert Graves, Jr. and Box Ranch, a Florida corporation; Via Tropical Fruits, Inc., a Delaware corporation; Via North American, Inc., a Delaware corporation; and Compagnie de Navigation Mixte, a company organized under the laws of the Nation of France, Appellees.
Nos. 4D01-312, 4D01-363.
District Court of Appeal of Florida, Fourth District.
November 13, 2002.
Rehearing Denied December 24, 2002.
*729 Mark P. Dikeman and Eugene E. Stearns of Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Miami, for appellant.
Jack Scarola and Ellen F. Brandt of Searcy, Denney, Scarola, Barnhart & Shipley, P.A. and Barbara J. Compiani of Caruso, Burlington, Bohn & Compiani, P.A., West Palm Beach, for appellees Nevins, Huff, Vista & Dearhardt.
HAZOURI, J.
Huff Groves, Vista Packing Co., Dearhardt Groves, Inc. and Nevins Fruit Co., Inc. (Plaintiffs) filed suit against Caulkins Indiantown Citrus Company ("Caulkins") for breach of standard form fruit participation contracts. The case proceeded to a jury trial and at the close of the Plaintiffs' evidence, the trial court entered a directed verdict and final judgment in favor of Caulkins and against Plaintiff, Nevins Fruit. Nevins Fruit timely appeals from this directed verdict and final judgment. (Case No. 4D01-312). The jury trial proceeded on the remaining Plaintiffs' claims. Pursuant to the jury's verdict, final judgment was entered in favor of the remaining Plaintiffs and against Caulkins. Caulkins timely appeals on the basis that the jury's verdict was not supported by competent substantial evidence and Plaintiffs cross-appeal (Case No. 4D01-363). These cases have been consolidated for this appeal.

Material Facts
The Plaintiffs are citrus growers and Caulkins operates a citrus processing plant which processes fruit into frozen concentrate and other byproducts and sells the end product to third party buyers. Plaintiffs entered into separate but identical standard form fruit participation contracts ("the contract") with Caulkins, agreeing to supply Caulkins with citrus. This case deals with whether Caulkins breached the contract by incorrectly calculating the monies due Plaintiffs.
In September 1988, Via North America, Inc. (VNA), a U.S. holding company of Compagnie de Navigation Mixte (CNM) and Compagnie Francaise de Sucrerie (CFS), acquired all the common stock of Caulkins.[1] The citrus groves and the related grove assets were purchased and are operated by Via Tropical Fruits, Inc. (VTF), a wholly owned subsidiary of VNA. Caulkins continued to solely operate the fruit processing plant. Prior to September 1988, Caulkins was owned equally by three *730 limited partnerships whose groves, which are now owned by VTF, supplied and continue to supply a portion of the fruit processed by Caulkins.
In addition to processing the fruit supplied by VTF, Caulkins processes fruit acquired through individual cash purchases and through the standard participation contracts at issue in this case. The contract was drafted by Caulkins and was used by Caulkins prior to the purchase by the French company.
Pursuant to the contract, Plaintiffs agreed to sell citrus fruit to Caulkins for processing over four growing seasons between 1989 and 1993. Caulkins' payments to Plaintiffs are quantified on a dollars per pound solid base and are referred to in the industry as the "pool return." The pool return is calculated by pooling the revenue from the sale of all fruit products and deducting its fees and operating and processing expenses. The pool return is paid to Plaintiffs on a pro rata basis, depending on the amount and the type of fruit delivered to Caulkins. The contract further provides that the price to be paid shall be computed by a firm of certified public accountants selected by Caulkins.
Although the contract was not amended, once the French company acquired Caulkins in 1988, Caulkins decided to revise the way in which it calculated the pool return by reclassifying what would be considered revenue and what would be considered an expense.
Huff Groves, Dearhardt and Vista supplied fruit pursuant to the contract during the 1989-90 season, the first season that the pool calculation was revised. Dearhardt and Vista also supplied fruit pursuant to the contract during the 1990-91 season and Vista again during the 1991-92 season. They were never informed that Caulkins had revised its pool calculation. On the contrary, Palmer Tuthill, the plant manager, testified that he informed growers that business would continue as usual. Tuthill and Plaintiffs testified that as a result of the revised calculation, the pool return substantially decreased, dropping the return from one of the highest in the state to one of the lowest for the 1989-90 and 1990-91 seasons.
Herman Heise, an owner of Dearhart Groves, Raphael Viamonte, an owner of Vista, and Nancy Huff, an owner of Huff Groves, admitted that they had no understanding of how the calculations were made, but simply relied on Tuthill and Caulkins' previous larger pool returns. Their understanding was that Caulkins' change in ownership would not affect the growers.
Nevins contracted with Caulkins for the 1992-93 and 1993-94 seasons. Jesse Parrish, Nevins' president and owner, testified that he entered into the contract because of Caulkins' reputation in the industry. Nevins did not renew the contract for the 1994-1995 season, because of the low pool returns. Parrish admitted that he did not know how Caulkins had calculated its pool returns in the past, including how it determined interest expenses attributable to the pool or whether growers were credited with overyield.
In April 1996, Plaintiffs filed a breach of contract action against Caulkins, alleging Caulkins underpaid them on their contracts by incorrectly calculating the pool return. The following six claims were at issue during the jury trial: (1) Caulkins failed to include proceeds from the sale of overyield in computing the pool return ("Overyield"), (2) Caulkins failed to properly account for proceeds from the sale of foreign frozen concentrate in computing the pool return ("Export Gain"), (3) Caulkins improperly deducted grove operation costs from the pool return ("Grove Operations"), *731 (4) Caulkins improperly deducted production and operating costs from the pool return ("Production and Operating Costs"), (5) Caulkins improperly deducted certain interest expenses from the pool return ("Extraordinary Interest"), and (6) Caulkins improperly utilized purchase accounting adjustments when calculating the pool return ("Accounting Adjustments").
Plaintiffs' principal expert was Soneet Kapila, a forensic accountant. Although he did not have prior experience with the citrus industry, he familiarized himself with the terminology of the industry in order to understand, audit, and recalculate the pool returns. When auditing the pool returns for the relevant years, he discovered various errors, including errors in the allocation of revenue to individual growers based on the type of fruit that they contributed. He also discovered errors in general in the area of extraordinary interest, export gain, overyield, and production and operating costs, which are discussed in depth below. Based on his calculations, Kapila testified as to the total amount of damages that each Plaintiff suffered during each season.

Overyield
In order to increase the quality of juice in this state, Florida developed a juice extractor test. A state inspector tests the fruit arriving at a plant and gives a figure of pounds soluble solids per box that may be squeezed from the fruit. Initially, a factoring system was implemented, pursuant to which processors had to pay a fine when their juice yield exceeded the amount set by the state inspector. Eventually, technology allowed for the extraction of greater yields and the factoring system ended. Nevertheless, state inspectors continue to determine a yield amount. Overyield refers to juice extracted from fruit which exceeds the quantity set by the state inspector.
Prior to 1988, the revenue from overyield was credited to the pool return. Beginning in 1989, Caulkins began to retain a portion of overyield revenue. Andrew Taylor, Caulkins' chief financial officer, testified that Caulkins ultimately determined that the contract language allowed it to retain overyield and did not need modification. During the 1990-91 season and thereafter, Caulkins retained all of the overyield revenue. Taylor further testified that Caulkins could have always retained overyield pursuant to the contract, but had previously decided not to for competitive reasons. Kapila determined that overyield should have been credited to the growers and did so when recalculating the pool returns.

Export Gain
Caulkins imported fruit from Brazil for processing and exported concentrate for sale to Japan. In order to avoid paying a duty or tax, Caulkins' aim was to export and import the same quantities. The exported product resulted in higher profits than the domestic product. Prior to purchase by the French company, the export gain was credited to the pool return. However, after the change in ownership, Caulkins began to retain the export gain and not credit it to the pool return. Taylor, Caulkins' C.F.O., testified that Caulkins always had the right to retain the export gain but had not previously exercised that right. According to Devlin, the activity associated with importing fruit and exporting product was performed outside the role of processing fruit on behalf of growers and as a result the profit should not benefit the growers.
Kapila testified to the amount of damages Plaintiffs suffered as a result of Caulkins' failure to credit the pool return with the export gain. During cross-examination, Kapila admitted that he failed to deduct the import tax on Brazilian fruit when *732 calculating the export gain. He explained that he credited the pool return with 100% of the export gain, based on the information received from Caulkins.

Production and Operating Costs
Plaintiffs argued that Caulkins improperly charged the pool with expenses related to the operation of VTF, its sister company. Stephanie Grey, a receptionist of Caulkins, testified that Roger Barret, the chairman of the board of directors of Caulkins, divided his time equally between Caulkins and VTF. Taylor testified that Barret did some work for VTF, but worked for Caulkins the majority of the time. Taylor testified that Barret's salary and benefits were charged to the pool return because they constituted an operating expense for Caulkins. Taylor explained that both his salary and Lacene Orvis' salary were paid 60% by Caulkins and 40% by VTF, but that both worked 80% of the time for Caulkins and 20% of the time for VTF.

Extraordinary Interest
In December 1989, expectations for the 1990-91 season were that a harsh winter would result in a short supply of citrus causing an increase in the market price. In order to secure a supply of citrus, Caulkins entered into floor contracts with various growers, including Huff Groves and Vista Packing for the 1990-91 season.[2] The floor contracts guaranteed growers a minimum price for their citrus. Contrary to expectations, there was a large supply of citrus and the market price decreased, resulting in a loss to Caulkins on the floor contracts. As a result, Caulkins borrowed money from VNA, its parent company, in order to cover the losses. When calculating the pool return for subsequent seasons, Caulkins deducted interest on the borrowed funds. Plaintiffs argued that Caulkins breached the contract by deducting from the pool return interest on money borrowed on a prior season.
Thomas Devlin, an auditing partner for Price Waterhouse who audited Caulkins, and Warren Tedder, a CPA, testified on behalf of Caulkins that interest is related to Caulkins' operation of the plant and as such may be charged to the pool under the contract.
Geoffrey Jones, a CPA who did accounting work for Caulkins in the late 1980s, testified that it was not appropriate to deduct from the pool return interest on money borrowed to pay off losses. Kapila also testified that this interest, which he referred to as extraordinary interest, should not have been charged to the pool.

Directed Verdict
At the conclusion of the Plaintiffs' case, Caulkins moved for a directed verdict against all Plaintiffs on all claims. With regard to Nevins Fruit, Caulkins argued that its claim was for the 1992-93 and 1993-94 seasons and by that time the pool returns were treated the same way as they were treated in the previous year and there was no testimony that Nevins expected the returns to be treated any differently. Nevins agreed that there was no evidence that Nevins had any knowledge of Caulkins' course of conduct before 1992-93 or had a course of dealings with Caulkins before 1992-93; however, Nevins argued that the contract unambiguously provided that the pool return should have included revenue for overyield and evidence showed that instead Caulkins retained that revenue.
The trial court found that Nevins' contract with Caulkins was well after Caulkins had changed the way they calculated the *733 pool return and there was no testimony that Nevins knew how Caulkins used to calculate the pool return prior to the transfer of ownership or had any expectation that the pool return would be calculated any differently than it was. Accordingly, the trial court granted Caulkins' motion for a directed verdict against Nevins as to all its claims. The trial court denied the motion as to the remaining Plaintiffs.

Jury Verdict
The jury ultimately returned a verdict in favor of Plaintiffs on the claims dealing with Extraordinary Interest, Export Gain, Overyield and Grove Operations, and in favor of Caulkins on the Production and Operating Costs and Accounting Adjustments claims. The jury allocated damages on each claim as follows:

Overyield: Huff Groves$292
 Vista Packing$19,767
 Dearhardt Groves$541
Export Gain: Huff Groves$539
 Vista Packing$24,711
 Dearhardt Groves$726
Extraordinary Interest: Vista Packing$8,933
 Dearhardt Groves$673

On the Grove Operations claim, the jury determined that Plaintiffs' damages amounted to $1.
The Extraordinary Interest, Export Gain and Overyield claims are the subject of Caulkins' appeal, while the Production and Operating Costs claim is the subject of Plaintiffs' cross-appeal. Nevins appeals from the directed verdict and final judgment the trial court entered against it at the conclusion of the Plaintiffs' evidence.
Caulkins argues that the jury's verdict that it breached the contract when it improperly accounted for extraordinary interest, export gain and overyield when calculating the pool return was not supported by substantial, competent evidence and is reversible on appeal.
A jury verdict that is supported by substantial, competent evidence is not reversible on appeal. Where there is conflicting evidence, the jury's verdict should not be disturbed. See Broward County v. Sattler, 400 So.2d 1031, 1033 (Fla. 4th DCA 1981); Espino v. Anez, 665 So.2d 1080, 1081-82 (Fla. 3d DCA 1995); Grossman v. Sea Air Towers, Ltd., 513 So.2d 686, 688 (Fla. 3d DCA 1987).
Caulkins does not dispute that the pool return was charged interest that was incurred on money borrowed from VTF to cover losses sustained from floor contracts. Caulkins contends the undisputed evidence at trial established that interest is an allowed expense under paragraph 6 of the fruit participation contract as "other income (deductions) net," and Plaintiffs failed to introduce evidence that the deduction of interest violated the terms of the contract. Paragraph 6 provides:
6. PRICE: Buyer agrees to process the fruit delivered hereunder into chilled juice or frozen concentrate, as it may elect. Said fruit shall be processed and sold together with all other participation fruit. From the net sales price of the finished product there shall be deducted the following:
(a) Buyer's actual operating expenses; including plant, storage, freezing, warehousing, selling, administrative, other income (deductions) net, etc., as determined by an independent audit.
(Emphasis added).
Generally, where the language of a contract is ambiguous, parol evidence is admissible to explain or clarify the intention of the parties. See Royal Am. Realty, Inc. v. Bank of Palm Beach & Trust Co., 215 So.2d 336, 338 (Fla. 4th DCA 1968). It is not clear that the interest at issue here is a deductible operating expense as contemplated in paragraph 6. Thus, it was up to the jury to determine whether such *734 interest was properly deducted by Caulkins as "other income (deductions) net."
Thomas Devlin, an auditing partner for Price Waterhouse who audited Caulkins, and Warren Tedder, a CPA, testified on behalf of Caulkins that interest is related to Caulkins' operation of the plant and as such may be charged to the pool under the contract. However, Geoffrey Jones, a CPA who did accounting work for Caulkins in the late 1980s, testified that it was not appropriate to deduct this interest from the pool return. Contrary to Caulkins' assertions, Kapila, Plaintiffs' expert, also explained that the interest on money borrowed from VNA to cover losses on floor contracts was improperly charged to the pool return. Thus, there was substantial, competent evidence to support the jury verdict as the conflict in the evidence was for the jury to determine.
Caulkins also contends that the amount of damages calculated by Kapila and relied upon by the jury when determining damages was not supported by the evidence. See George Hunt, Inc. v. Dorsey Young Constr., Inc., 385 So.2d 732, 733 (Fla. 4th DCA 1980) (evidence as to the amount of damages cannot be based on speculation or conjecture, but must be proven with certainty) (citing Hodges v. Fries, 34 Fla. 63, 15 So. 682 (1894)). See also Husky Indus., Inc. v. Black, 434 So.2d 988, 992 (Fla. 4th DCA 1983) (an expert opinion is inadmissible where it is apparent that the opinion is based on insufficient data).
Kapila testified that he and his team audited Caulkins' pool return and determined what amount was improperly deducted as interest. He testified that his team made this determination after examining all the documents provided by Caulkins during discovery. Therefore, there was sufficient evidence from which Kapila could give an opinion and it was up to the jury to evaluate that opinion based on his credentials. We conclude there is no basis to reverse the jury verdict on this issue.
As to the export gains, Caulkins does not dispute that it did not credit the pool return with the gain derived from the sale of exported product. Caulkins contends there was insufficient evidence that it breached the contract by failing to include that gain in the pool return.
However, as Plaintiffs assert, the plain language of the contract provides that the pool return should have been credited with the export gain. Paragraph 6 provides:
6. PRICE: Buyer agrees to process the fruit delivered hereunder into chilled juice or frozen concentrate, as it may elect. Said fruit shall be processed and sold together with all other participation fruit. From the net sales price of the finished product there shall be deducted...
(Emphasis added). Paragraph 6 clearly provides that all fruit is to be processed and sold together and the price is to be computed from the net sales price of the finished product. Thus, the growers are entitled to the revenue generated from all the sales of the finished product, including that which is exported. If Caulkins wanted to deduct profit derived from exported product, it could have listed it as one of the enumerated deductions. Therefore, there was substantial, competent evidence that Caulkins breached the contract when it failed to credit the pool return with the export gain.
Caulkins further contends that the amount of damages computed by Kapila and relied upon by the jury was incomplete. Kapila testified to the amount of damages Plaintiffs suffered as a result of Caulkins' failure to credit the pool return with the export gain. During cross-examination, Kapila admitted that he did not *735 deduct the tax imposed on imported fruit from Brazil when calculating damages. He explained that he credited the pool return with 100% of the export gain, based on the information received from Caulkins.
Kapila's admission that he did not deduct the import tax when calculating export gain damages does not render his calculation of damages incomplete. There was no evidence that the tax imposed on imports affected the profit derived from the sale of exported product. Further, the jury was asked, "[W]hat was the amount of damages, if any, suffered by the following plaintiffs resulting from a failure of Caulkins to include proceeds from the foreign sale of frozen concentrate in computing the price to be paid to pool participants?" The jury was not asked to deduct taxes imposed on imports from the proceeds from foreign sales. Thus, the amount of damages as determined by the jury was supported by competent, substantial evidence.
As to the issue of overyield, Caulkins does not dispute that it did not credit growers with revenue generated from overyield. Caulkins contends that the contract unambiguously provides in paragraph 4 that the grower is not entitled to credit for overyield and that no witness testified otherwise. Paragraph 4 provides:
4. TIME QUALITY: All determination as to classification or quantity of fruit received and as to gallonage or pound solids, shall be fixed by the daily test made by Florida State Inspectors, stationed at the premises of Buyer. After such inspections and acceptance of the fruit by Buyer, the fruit shall become the property of Buyer and Buyer's sole remaining obligation to Seller shall be for the payment of the price, as set forth herein.
(Emphasis added).
Plaintiffs acknowledge that the parties' course of dealing is inapplicable to this case. Plaintiffs contend that as recognized by the Uniform Commercial Code (UCC), evidence of usage of trade and good faith are relevant in construing the contract. Section 671.203, Florida Statutes (1995), provides that there is an obligation of good faith in the performance or enforcement of every contract. Section 671.205 provides that the usage of trade in which the parties are engaged gives particular meaning to supplement or qualify terms of an agreement.
However, where a contract is clear and unambiguous, the express contract terms may not be varied by resort to extrinsic evidence, including that related to the UCC obligation of good faith or custom and usage. See Indian Harbor Citrus, Inc. v. Poppell, 658 So.2d 605, 606 (Fla. 4th DCA 1995); see also Farr v. Poe & Brown, Inc., 756 So.2d 151, 152-53 (Fla. 4th DCA 2000) (custom or usage may be employed to explain or qualify the terms of a contract that would otherwise be ambiguous, but not to contradict the express terms of a contract). The interpretation or construction of a contract that is clear and unambiguous is a matter of law that is reviewed de novo. See Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A., 771 So.2d 628, 631 (Fla. 4th DCA 2000).
The contract is not ambiguous with regard to whether growers should be credited with overyield. Paragraph 4 clearly provides that the quantity of the fruit delivered is fixed by the test of the state inspector. The testimony at trial established that "overyield" refers to juice extracted from fruit which exceeds the quantity set by the state inspector. Thus, the express terms of the contract clearly and unambiguously allow Caulkins to retain overyield, and it was error for the jury to consider the concepts of usage of trade or good faith in interpreting the contract. *736 Therefore, Caulkins did not breach the contract when it retained overyield in calculating the pool returns and Plaintiffs are not entitled to damages in this regard.
Finally, Caulkins argues that pursuant to the contract, the parties agreed that the participating growers' sole remedy would be for an accounting and as a condition precedent to that remedy, an accounting must be requested within thirty days of receipt of the pool return. Caulkins contends that because Plaintiffs did not satisfy this condition precedent, their claims are barred as a matter of law. That portion of the contract relied upon by Caulkins provides:
11. INSPECTION OF BOOKS: The price to be paid hereunder by Seller to Buyer shall be computed by a firm of certified public accountants selected by Buyer. In the event Seller questions the price computed by Buyer, he must do so within a period of 30 days after receipt of notice, otherwise the price computed by Buyer shall be final and binding. Seller shall have the right, at its expense, to have Buyer's books examined by a firm of certified public accountants selected by Seller. Said firm of certified public accountants shall agree in writing with Buyer that no information other than the accuracy of the price computed by Buyer shall be transmitted to any other person, firm, or cooperation [sic], excluding Seller and such examination shall be at Seller's expense.
(Emphasis added).
Plaintiffs argue that their claims are not based on the price computed, but rather, on Caulkins' breach of contract in its determination to improperly exclude certain income items from the pool return. Plaintiffs assert that an audit based on Caulkins' representations would not have revealed those breaches. Plaintiffs further argue that paragraph 2 provides for a breach of contract action. Paragraph 2 provides:
2. DELIVERY: ... If Seller fails to deliver to Buyer during the processing season the entire number of boxes of fruit specified below, Seller shall immediately pay to Buyer the sum of $2.00 for each and every box of fruit which Seller fails to deliver plus any advances as liquidated damages (with interest at two points above prime rate), it being recognized by Buyer that it is extremely difficult to fix the actual amount of boxes because of certain inaccuracies in establishing fruit crops and weather conditions. Reasonable judgment will be used. Said provision for liquidated damages shall be without prejudice to any legal remedy Buyer may have in the event of an action in any court, be it either party to enforce the terms of the agreement or the other breach thereof, the prevailing party shall be entitled to recover from the other all costs and expenses in connection therewith, including a reasonable attorney's fee.

(Emphasis added).
Contrary to Caulkins argument, paragraph 11 does not provide that the grower's sole remedy is for an accounting. Paragraph 2 supports this interpretation by acknowledging that either party may enforce the terms of the contract through a breach of contract action. Further, with respect to paragraph 11, Caulkins' accountant testified that the firm never audited the pool returns and that Caulkins calculated the pool return itself. Thus, Caulkins itself never complied with paragraph 11. Therefore, the contract did not require Plaintiffs to fulfill any conditions precedent to filing their suit for breach of contract.
On cross-appeal, Plaintiffs argue that the jury's failure to find that Caulkins *737 breached the contract by improperly allocating production and operating costs to the pool, including charging the pool return with expenses related to the grove operation of VTF, was not supported by competent substantial evidence.
Plaintiffs argued at trial that Caulkins improperly charged the pool return with the salaries and benefits of employees that also worked for VTF. Caulkins did not dispute that it charged the pool return with the salaries of Roger Barret, the chairman of the board of directors of Caulkins, Andrew Taylor, Caulkins' chief financial officer, and Lacene Orvis, Caulkins' president. However, Taylor testified that the salaries were charged to the pool return, because they constituted an operating expense for Caulkins. Taylor explained that both his salary and Lacene Orvis' salary were paid 60% by Caulkins and 40% by VTF, but that both worked 80% of the time for Caulkins and 20% of the time for VTF. He further testified that the majority of Barret's time was spent working for Caulkins and he only did minimal work for VTF. The jury apparently determined, based on Taylor's testimony, that the salaries were properly charged to the pool. Thus, there was substantial, competent evidence to support the jury's verdict that Caulkins did not breach the contract on this issue.
On Nevins' claims, it asserts that the trial court erred when it granted Caulkins' motion for a directed verdict and entered final judgment against Nevins as to all of its claims. The trial court agreed with Caulkins' argument that Nevins' claims were for the 1992-93 and 1993-94 seasons and by that time the pool returns were treated the same way as they were treated in the previous year and there was no testimony that Nevins expected the returns to be treated any differently.
When reviewing a claim that the trial court erred in granting a motion for directed verdict, the evidence and all reasonable inferences adduced therefrom must be viewed in the light most favorable to the nonmoving party, and all conflicts in the evidence must be resolved in favor of the nonmoving party. See First Nat'l Bank & Trust Co. of Treasurer Coast v. Pack, 789 So.2d 411, 413 (Fla. 4th DCA 2001); Town of Palm Beach v. Ryan Inc. E., 786 So.2d 665, 668 (Fla. 4th DCA 2001).
On the claim for overyield, the trial court did not err in granting a directed verdict. As discussed above, the contract unambiguously provides that Caulkins was allowed to retain overyield. Thus, there was no breach and no factual issue to be determined by the jury.
The trial court reversibly erred when it granted a directed verdict and entered final judgment against Nevins on its remaining claims. Although by the 1992-93 season, Caulkins had already been calculating the pool return in the same fashion, Caulkins had not amended the contract. Thus, whether Caulkins continued to breach the contract in calculating the pool return each year was still to be resolved. The fact that the pool was charged with extraordinary interest and was not credited with the export gain during the three seasons before Nevins contracted with Caulkins is not dispositive. The jury could have determined, as it did on the claims of the other Plaintiffs, that Caulkins was breaching the contract during those seasons and there was no evidence that Nevins knew of that breach and somehow acquiesced to it by subsequently entering into the same contract. The testimony of Parrish, Nevins' president, was that he did not know how Caulkins had calculated its pool returns in the past, including how it determined interest expenses attributable to the pool.
*738 We reverse the directed verdict granted in favor of Caulkins against Nevins except as to Nevins claim for overyield damages and remand for a new trial. With respect to the jury verdict and final judgment, we affirm in all respects except as to the Plaintiffs' claim for overyield damages and direct the court to enter judgment for Caulkins on the claim for breach of contract for overyield damages.
STONE and MAY, JJ., concur.
NOTES
[1] The parties refer to this purchase as the purchase of Caulkins by the French company.
[2] The floor contracts Huff Groves and Vista Packing entered into were in addition to and separate and distinct from the participation contract at issue here.