Steven A. SCIARETTA, as trustee of the Barton Cotton Irrevocable Trust a/k/a the Amended and Restated Barton Cotton Irrevocable Trust, Plaintiff/Counterclaim Defendant,

v.

The LINCOLN NATIONAL LIFE INSURANCE COMPANY, Defendant/Counterclaim Plaintiff/Third–Party Plaintiff,

v.

Sanford Muchnick, an individual, and as trustee of the Barton Cotton Irrevocable Trust, Third–Party Defendant.

Case No. 9:11–cv–80427.

United States District Court, S.D. Florida.

Feb. 15, 2012.

Eric Biderman, James M. Westerlind, Julius A. Rousseau, Arent Fox, LLP, New York, NY, Thomas L. David, Coral Gables, FL, for Plaintiff/Counterclaim Defendant.

Nicole C. Wixted, Michael D. Rafalko, Nolan B. Tully, Drinker, Biddle & Reath, LLP, Philadelphia, PA, Charles J. Vinicombe, Drinker Biddle & Reath LLP, Princeton, NJ, Wendy Lynn Furman, Pett Furman PL, Boca Raton, FL, for Defendant/Counterclaim Plaintiff/Third–Party Plaintiff.

Thomas L. David, Coral Gables, FL, for Third–Party Defendant.

*ORDER GRANTING IN PART PLAINTIFF STEVEN A. SCIARETTA'S MOTION FOR SUMMARY JUDGMENT; DENYING THIRD PARTY DEFENDANT SANFORD MUCHNICK'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING IN PART DEFENDANT/COUNTERCLAIM PLAINTIFF/THIRD PARTY PLAINTIFF THE LINCOLN NATIONAL LIFE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT*

DONALD M. MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court upon the parties' following Motions: (1) Plaintiff Steven A. Sciaretta's Motion for Summary Judgment ("Plaintiff's Motion") (DE 54) filed on December 5, 2011; (2) Third Party Defendant Sanford Muchnick's Motion for Summary Judgment ("Muchnick's Motion") (DE 72) filed on January 6, 2012; and (3) Defendant/Counterclaim Plaintiff/Third Party Plaintiff The Lincoln National Life Insurance Company's ("Lincoln") Motion for Summary Judgment ("Lincoln's Motion") (DE 75) filed on January 6, 2012. I have reviewed the matter and am advised in the premises.

## I. BACKGROUND

Plaintiff Steven Sciaretta, as trustee of the Barton Cotton Irrevocable Trust ("Cotton Trust") filed suit in this Court against The Lincoln National Life Insurance Company ("Lincoln") on April 21, 2011 to recover death benefits on an insurance policy insuring the life of Cotton ("Policy"). (DE 1). On May 25, 2011, Lincoln filed its Answer and Counterclaim alleging that the Policy was void *ab initio* for lack of an insurable interest and asserting counterclaims against Plaintiff and

Sanford Muchnick, a previous trustee of the Cotton Trust, for fraud, negligent misrepresentation and civil conspiracy. (DE 7 at 6). Lincoln alleges that the instant case is a stranger-originated life insurance ("STOLI"), in which a life insurance policy is applied for and issued at the behest of individuals or entities with no insurable interest in the life of the insured who later acquire some, if not all, of the interest in the death benefit payable upon the death of the insured. (*Id.*). Lincoln alleges that in May 2008, Sciarretta and Muchnick executed a STOLI scheme to procure a $5 million insurance policy on Cotton's life. (*Id.* at 8). As part of the scheme, Lincoln alleges that the policy was applied for on Cotton's life and a Trust was set up nominally in his name to be designated as the owner and beneficiary of the policy to conceal the intent to sell the policy and/or beneficial interest in the Trust on the secondary market. (*Id.* at 10–11).

The following facts are uncontested by the parties. On April 1, 2008, Mr. Cotton entered into an Exclusive Rights Agreement ("ERA") with Wealthmodes, LLC. (DE 110 at 7). In the ERA, Wealthmodes paid Mr. Cotton an "Exclusive Rights Fee," which was equal to the initial premiums owed to Lincoln for the life insurance policy that is the subject of this lawsuit, in exchange for certain exclusive rights. (*Id.*). Thereafter, on May 8, 2008, Cotton signed the Barton Irrevocable Trust. (*Id.*). The parties are unaware of the identity of the person or entity that drafted the Trust agreement, but the original Trustee of the Trust was Mr. Muchnick. (*Id.* at 7–8). The day after the Cotton Trust was formed, Cotton and Muchnick signed an Application ("Application") that was submitted to Lincoln seeking an $8 million life insurance policy ("Policy"). (*Id.* at 8). In the Application, Cotton and Muchnick answered "No" to the following questions:

Have you, you, the proposed [insured or owner], been involved in any discussion about the possible sale or assignment of this policy or a beneficial interest in a trust, LLC or other entity created or to be created on your behalf?

Is this policy being funded via a premium financing loan or with funds borrowed, advanced or paid from another person or entity?

Will you, the proposed [insured or owner] and/or beneficiary, and/or any entity on your behalf, receive any compensation, whether via the form of cash, property, an agreement to pay money in the future, a percentage of the death benefit, or otherwise, if this policy is issued?

(*Id.*). The Application also represented that Cotton's annual income was $730,000, although his tax return from the 2007 tax year reflected that his income was only $170,999. (*Id.* at 8–9).

On June 6, 2008, Lincoln issued a $5 million policy to the Trust as the owner and beneficiary, insuring the life of Cotton. (*Id.* at 9). Lincoln paid $268,501.83 in commissions to Dennis Felcher, who was the broker of record for the Policy, and Madison Brokerage, a broker general agency, in connection with the issuance of the Policy. (*Id.*). The Policy contained a clause providing that the Policy would take effect "only when: 1) the Policy has been delivered to and accepted by me/us; 2) the initial premium has been paid in full during the lifetime of the Proposed Insured(s); and 3) the Proposed Insured(s) remain in the same state of health and insurability as described in each part of the application at the time conditions 1) and 2) are met." (*Id.*).

On June 12, 2008, Wealthmodes forwarded $55,825.00 to Cotton, which was intended, as per the ERA, to be used to pay the first premium payment for the Policy. (*Id.*). Cotton deposited the money

into his bank account and then wrote a personal check for the same amount to Lincoln for the initial premium payment for the Policy. (*Id.*). On August 1, 2008, Cotton deposited a check from Simba Group, LLC ("Simba") into his bank account for $12,125.00 and then wrote a check for the same amount the next day payable to Lincoln as premiums for the Policy. (*Id.* at 10). On October 8, 2010, Simba wired $6,717.52 to Cotton's bank account and then Cotton wrote a check for the same amount the next day payable to Lincoln as premiums for the Policy. (*Id.*).

On October 16, 2008, the Trust signed an Application and Loan Agreement for the purpose of obtaining a premium finance loan with Imperial Premium Finance, LLC ("Imperial"). (*Id.* at 11). Pursuant to the loan, the Trust borrowed $335,066.67 from Imperial to finance premium payments on the Policy through August 6, 2012. (*Id.*). The loan had a floating interest rate of 11.5–16% and fees and charges totaling more than $110,000. (*Id.*). To protect its interest in the Policy, Imperial had Cotton and the Trust sign three irrevocable powers of attorney. (*Id.*). On September 1, 2010, Imperial informed the Trust that $521,887.39 must be repaid to satisfy the loan and retain the Policy. (*Id.*). Offers to purchase the Policy were extended by two different companies: Abacus Settlements, LLC and Habersham Funding, LLC. (*Id.*).

Cotton was diagnosed with terminal esophageal cancer on May 19, 2010 and died shortly thereafter on October 18, 2010. (*Id.*). Plaintiff submitted a claim to Lincoln for payment of the Policy's death benefit on October 29, 2010, although Lincoln has not paid the death benefit under the Policy. (*Id.*).

## II. PARTIES' ARGUMENTS

Plaintiff, Lincoln, and Muchnick each filed separate Motions for Summary Judg-ment in this action. In his Motion, Plaintiff first argues that the Policy was not issued in violation of Florida's insurable interest laws and therefore is not void *ab initio*. (DE 54 at 7). Second, Plaintiff argues that Lincoln's material misrepresentation and fraud claims and defenses are barred by Florida's incontestability statute. (*Id.* at 14). Third, Plaintiff contends that Lincoln's "condition precedent" argument fails because it conflicts with Florida's incontestability statute. (*Id.* at 16). Finally, Plaintiff asserts that Lincoln materially breached the Policy by failing to pay out the death benefits to the Cotton Trust and that it is entitled to recover attorney's fees in this action. (*Id.* at 19–20).

Muchnick argues in his Motion that summary judgment should be granted in his favor because there is no evidence to support the counts of fraud, negligent misrepresentation, and civil conspiracy; there is no tort cause of action against him after the incontestability period; and he is not personally liable under Florida law. (DE 72 at 4–6).

In its Motion, Lincoln first argues that the Policy lacked an insurable interest at inception and is therefore void *ab initio*. (DE 75 at 5). To support its argument, Lincoln contends that this Court should apply a good faith requirement to Florida's insurable interest statute. (*Id.* at 6). Second, Lincoln asserts that it is entitled to summary judgment based on the failure of a condition precedent in the Policy application. (*Id.* at 18). Next, Lincoln argues that it is entitled to retain the premiums paid to it for the Cotton Policy. (*Id.* at 19–20). Finally, Lincoln contends that Plaintiff's affirmative defenses based on waiver and estoppel are not legally viable. (*Id.* at 20–21).

## III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a district court's decision to grant summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of material fact is genuine where the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *See Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 919 (11th Cir.1993)). A district court's central inquiry when determining whether it should grant a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). After the parties have had adequate time to conduct discovery and a party files a motion for summary judgment, a district court must grant summary judgment against a party who fails to establish the existence of an element essential to his case that he bears the burden of proof on during trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of demonstrating to the court that the record does not contain any genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). Whether a fact is material or not is a question that requires the moving party to defer to substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Pursuant to Rule 56, a moving party may accompany its motion for summary judgment with supporting affidavits; however, the movant is not required to file any affidavits. *See* Fed.R.Civ.P. 56(a)-(b). That being said, a district court may not consider an unsworn statement when "determining the propriety of summary judgment." *Gordon v. Watson,* 622 F.2d 120, 123 (5th Cir.1980) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 593–94 (11th Cir.1995) (per curiam) (internal citation and quotations omitted). In addition, the dispute must have a "real basis in the record" in order to constitute a genuine dispute of fact. *Pace v. Capobianco,* 283 F.3d 1275, 1278 (11th Cir.2002) (quoting *Mize,* 93 F.3d at 742) (internal quotations omitted). Thus, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England,* 432 F.3d 1321, 1327 (11th Cir.2005).

While conclusions and unsupported facts alone are insufficient to oppose a summary judgment motion, a district court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir.1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro,* 38 F.3d 1571, 1578 (11th Cir.1994) (per curiam)). In order to

demonstrate a genuine issue, the party opposing entry of summary judgment must establish sufficient evidence upon which a jury could reasonably rule in his favor; therefore, a mere "scintilla of evidence" alone is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. If the party opposing summary judgment produces any evidence, a district court must accept it as true and draw "all justifiable inferences" in his favor. *See id.* at 255, 106 S.Ct. at 2513.

## IV. DISCUSSION

### A. WHETHER POLICY LACKED AN INSURABLE INTEREST AT ITS INCEPTION

### 1. IS GOOD FAITH REQUIRED?

As a preliminary matter, this Court must consider whether there is a "good faith" requirement attached to Florida's statute regarding insurable interests. Fla. Stat. § 627.404 (2011) provides:

> Any individual of legal capacity may procure or effect an insurance contract on his or her own life or body for the benefit of any person, but no person shall procure or cause to be procured or effect an insurance contract on the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representative, or to any person having, at the time such contract was made, an insurable interest in the individual insured. The insurable interest need not exist after the inception date of coverage under the contract.

The parties agree that this statute requires that a life insurance policy must have an insurable interest at its inception in order to be valid. (DE 80 at 4, DE 94 at 3). It is also clear from the statute that the insured may sell the insurance policy to an individual or entity with no insurable interest after the policy is initially procured. The parties disagreement centers around whether there is a good faith requirement attached to the insurable interest statute prohibiting insureds from procuring life insurance with the intent of selling or assigning it to someone with no insurable interest. It is evident that a good faith standard is not explicitly provided for in the statute. However, two other courts in this District have found that the statute includes a good faith requirement. *See Pruco Life Insurance Co. v. Brasner*, No. 10–8084–CIV–COHN, DE 246 at 15 (S.D.Fla. Nov. 14, 2011) ("Florida law generally permits a life insurance policy to be assigned to an entity with no insurable interest in the life of the insured, but only if such assignments are made 'in good faith, and not [as] sham assignments made simply to circumvent the law's prohibition on 'wagering contracts.' ") (internal citations omitted); *AXA Equitable Life Insurance Co. v. Infinity Financial Group*, 608 F.Supp.2d 1349, 1356–57 (S.D.Fla.2009) (finding on a motion to dismiss that an amended complaint was adequate where it alleged that the insured's "procurement and the assignment of the [insurance] policies was not done in good faith, but was part of a scheme devised by defendants to obtain interests in insurance polices in which the defendants had no insurable interest").

 "Under Florida law, every contract contains an implied covenant of good faith and fair dealing, requiring the parties follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations." *Centurion Air Cargo, Inc. v. United Parcel Service Co.*, 420 F.3d 1146, 1151 (11th Cir.2005) (citing *Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1097 (Fla. 1st DCA 1999)). "A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation." *Id.* I find that there is an

implied covenant of good faith and fair dealing attached to Fla. Stat. § 627.404's requirement that there be an insurable interest at the inception of each insurance policy. Therefore if the insurance policy at issue "was procured with the intention that it will be assigned or otherwise transferred to a person or entity with no insurable interest in the life of the insured," *AXA Equitable,* 608 F.Supp.2d at 1357, it is void *ab initio.*

## 2. WAS THE POLICY PROCURED IN GOOD FAITH?

Having determined that there is a good faith requirement attached to the insurable interest statute, I must now consider whether the Policy "was procured with the intention that it will be assigned or otherwise transferred to a person or entity with no insurable interest in the life of the insured." *Id.* The *Berger* court identified three factors to consider when determining the intent of the insured in procuring a life insurance policy: (1) a pre-existing agreement or understanding that the policy is to be assigned to one having no insurable interest; (2) the payment of some or all of the premiums by someone other than the insured, and in particular, by the assignee; and (3) the lack of a risk of actual future loss. *Berger,* DE 246 at 16–17 (internal citations omitted). In *Berger,* there was overwhelming evidence that the insureds procured the life insurance policy in bad faith. Namely, both Mr. and Mrs. Berger testified at their depositions that neither of them intended to maintain the insurance policy. *Id.* at 17. Furthermore, "Mrs. Berger stated that she always knew that the policy would ultimately be owned by a third party who would collect the death benefit when she died if she died after the free insurance period." *Id.* The *Berger* court found this was sufficient to show that the Bergers "intended for the policy to be assigned or otherwise transferred to a person or entity with no insurable interest in Mrs. Berger's life and that there was a pre-existing understanding that the policy would be assigned to someone with no insurable interest." *Id.*

In this case, discovering the intent of Mr. Cotton at the time he procured the Policy is complicated by the fact that he is dead. However, Lincoln contends that circumstantial evidence indicates that the Policy was procured in bad faith and is therefore void *ab initio.* First, Lincoln points to the Exclusive Rights Agreement ("ERA") executed between Wealthmodes, LLC and Mr. Cotton on April 1, 2008. (DE 77–10 at 2). This ERA gave Wealthmodes a twelve-month exclusive right to obtain a life insurance policy for Mr. Cotton, and if Cotton accepted the policy, Wealthmodes was granted "the exclusive right to arrange for the sale of each and all of such Policies ... for a period of sixty (60) consecutive months from and after the Effective Date of each such Policy...." *(Id.* at 3–4). In exchange for this exclusive right, Wealthmodes paid Cotton an "Exclusive Rights Fee" which equals the initial premiums owed to Lincoln for the life insurance policy that is the subject of this lawsuit. (DE 110 at ¶ 20). Second, Lincoln argues that Cotton made material misrepresentations in his life insurance policy application that he had not been involved in discussions about the possible sale of the policy; the policy premium would not be advanced, borrowed, or financed; he would not be compensated on account of the policy being issued; and the Cottons' annual income was $730,000, when it was in fact $170,999. (DE 75 at 12). Third, the premium payments on Cotton's insurance policy were financed by Imperial. *(Id.* at 13). Fourth, Cotton wrote several emails suggesting that he was lied to by the trustee, Sciarretta, and threatening to report the scam to the authorities. *(Id.* at 15). Finally, Imperial marketed the Policy to secondary market

investors more than three months before the loan's maturity date and later foreclosed on the Policy in satisfaction of the loan. (*Id.* at 18).

██ Plaintiff argues that Lincoln does not prove that Cotton procured the Policy with the intention of assigning it to a person or entity with no insurable interest. First, Plaintiff states that the Policy has not been assigned to any third-party, including Wealthmodes and/or Imperial, and that Cotton is not alive to testify as to his intent. (DE 94 at 6). Second, the loan was not entered into until months after the Policy had been issued and it merely provides that the lender may exercise foreclosure rights in accordance with the loan documents and applicable law. (*Id.* at 9–10). Since foreclosure is not automatic and can be avoided altogether if the loan is repaid, Plaintiff claims it is not evidence of bad faith. (*Id.* at 10). Third, premium finance is an accepted manner of financing life insurance and the fact that the Policy was premium financed does not mean that the policy was procured in bad faith. (*Id.* at 11). Having reviewed the matter, I find that a genuine issue of material fact remains as to whether the life insurance policy was procured with the intention of assigning it to a person or entity with no insurable interest. Therefore summary judgment is not appropriate on this issue.

## B. FAILURE OF CONDITION PRECEDENT

The next issue to consider is whether Defendant is entitled to summary judgment based on the failure of a condition precedent.[1] Defendant contends that Cotton misrepresented in his Policy Application "that there had been no discussion regarding (1) a sale of the Policy in the secondary market, (2) that Cotton would be compensated in connection with the issuance of the policy and (3) that premium payments for the policy would not be financed or advanced." (*Id.* at 19). The Policy application contains a provision stating:

> [I]nsurance will take effect under the Policy when: 1) the Policy has been delivered to and accepted by me/us; 2) the initial premium has been paid in full during the lifetime of the Proposed Insured(s); and *3) the Proposed Insured(s) remain in the same state of health and insurability as described in each part of the application at the time conditions 1) and 2) are met.*

(*Id.* at 18) (emphasis added) [hereinafter the "Continued Insurability Provision"]. Defendant attests that due to the misrepresentations made in his Policy application, "Cotton's insurability, as represented to Lincoln in the application for the Policy, was not the same as Cotton's insurability on the date the policy was delivered." (DE 75 at 18). Accordingly, Defendant argues that this "resulted in the failure of a condition precedent to the Policy taking effect and renders the Policy void *ab initio.*" (*Id.*).

Plaintiff argues that the Continued Insurability Provision fails as a matter of law because it conflicts with Florida's incontestability statute. This statute provides:

> Every insurance contract shall provide that the policy shall be incontestable after it has been in force during the lifetime of the insured for a period of 2

---

1. In this Court's Order Denying Motion to Dismiss Defendant's Counterclaim (DE 11), I held that "[s]ince Lincoln states in its Counterclaim that it 'seeks a declaration that the Cotton Policy is void *ab initio* due to a lack of insurable interest at inception,' (DE 7 at 9), this Court finds that the counterclaim is not barred by Florida's incontestability clause." (DE 32 at 6). However, this finding is distinguishable from the situation here in which Defendant asks this Court to find that the Policy is void *ab initio* not for lack of an insurable interest, but rather for failure of a condition precedent.

years from its date of issue except for nonpayment of premiums and except, at the option of the insurer, as to provisions relative to benefits in event of disability as to provisions which grant additional insurance specifically against death by accident or accidental means. Fla. Stat. § 627.455 (2011). The Policy also contains a provision similar to the incontestability statute:

> We will not contest this policy after it has been in force during the Insured's lifetime for 2 years from the Issue Date. An increase in the Specified Amount will not be contested after it has been in force during the Insured's lifetime for 2 years from its effective date.

(Exh. 5). Fla. Stat. § 627.418 (2011) provides:

> Any insurance policy, rider, or endorsement otherwise valid which contains any condition or provision not in compliance with the requirements of this code shall not be thereby rendered invalid, except as provided in section 627.415, but shall be construed and applied in accordance with such conditions and provisions as would have been applied had such policy, rider or endorsement been in full compliance with this code.

Therefore if the Continued Insurability Provision is found to not be in compliance with Florida's incontestability statute, the Provision must be construed and applied so that it does not violate the statute.

■ Under Florida law, continued insurability clauses are generally treated as conditions precedent to be satisfied before the policy becomes effective. *See Griffin v. American General Life and Acc. Ins. Co.,* 752 So.2d 621, 623 (Fla. 2d DCA 1999); *Life Ins. Co. of North America v. Cichowlas,* 659 So.2d 1333, 1334 (Fla. 4th DCA 1995) ("Clauses requiring that an applicant may remain insurable between the filing of the application and the delivery of the policy have traditionally been approved by Florida courts."). Continued insurability provisions are "generally in the form of statements that the policy shall not take effect unless it is delivered during the continued insurability or sound health of the applicant." *Cichowlas,* 659 So.2d at 1334 (citations omitted); *see also Gulf Life Ins. Co. v. Green,* 80 So.2d 321, 321 (Fla. 1955) (finding that an insurance policy containing a clause stating "[t]his policy shall not take effect unless on the date of delivery hereof the insured is alive and in sound health" was violated when the insured lied about his health); *Griffin,* 752 So.2d at 622–23 (finding that a provision in a life insurance policy stating that "no insurance will take effect unless the first full premium is paid and a policy is delivered while the health of any proposed insured continues ... to be as represented in the application" was a valid condition precedent to the policy taking effect); *Wolk v. Lamar,* 202 So.2d 617, 619 (Fla. 3d DCA 1967) (concluding that an insurance policy with a clause stating "no such policy shall be effective until received .... and only then, if, at that time, the Proposed Insured's health, occupation, and other conditions are as described in the application"). Here, Lincoln does not allege that Mr. Cotton lied about his health in his Application. Therefore Lincoln attempts to expand the "same state of health and insurability" language contained in the Application to include misrepresentations that have no bearing on Mr. Cotton's health at the time he completed the Application. I do not believe this expansion is appropriate.

■ The Florida Supreme Court considered the meaning of "insurability" in *Mathews v. Metropolitan Life Ins. Co.,* 89 So.2d 641 (Fla.1956). In *Mathews,* the life insurance policy at issue contained a provision stating that "[t]he Company shall incur no liability under this application until

a policy has been delivered and the full first premium specified in the policy has actually been paid to and accepted by the Company during the lifetime and continued insurability of the applicant." *Id.* at 642. The Court found "that the 'continued insurability' clause may reasonably be interpreted as meaning the same state of health as at the time of the application and medical examination as at the time of the delivery of the policy" *Id.* at 643. Given this limited definition of the term "insurability," I do not believe that the Continued Insurability Provision applies to the alleged misrepresentations in Cotton's Application and I find that Lincoln's contention that the alleged misrepresentations made by Cotton in his Policy results in the Policy being void *ab initio* for failure to meet a condition precedent fails as a matter of law.

### C. RETENTION OF PREMIUMS PAID

This Court determined that there is still a genuine issue of material fact remaining whether the Policy lacked an insurable interest at its inception. Accordingly, it is unnecessary to determine whether Lincoln should be allowed to retain the insurance premiums paid at this time.

### D. SCIARETTA'S AFFIRMATIVE DEFENSES

Lincoln argues that the affirmative defenses raised by Plaintiffs are "barred as a matter of law because the life insurance policy at issue in this litigation is a wagering contract that is against the public policy of Florida, and Lincoln cannot waive or be estopped to claim that the Policy is void as a matter of public policy." (DE 75 at 21). I did not determine as a matter of law that the Policy is a wagering contract. Accordingly, Lincoln's motion for summary judgment on the issue of Plaintiffs' affirmative defenses must be denied.

### E. LINCOLN'S FRAUD AND NEGLIGENT MISREPRESENTATION COUNTS

▇ Plaintiff asks this Court to grant it summary judgment on Lincoln's material misrepresentation and fraud claims because they are barred by Florida's Incontestability Statute. (DE 54 at 14). In *Bankers Sec. Life Ins. Soc. v. Kane*, 885 F.2d 820 (11th Cir.1989), the Eleventh Circuit found that an insurance company "cannot bring a separate tort suit for fraud" when the "fraud suit would merely provide a different means to challenge the validity of the insurance contract." *Id.* at 822. I find that the instant case is distinguishable. First, if the Policy is found to be void *ab initio* because there was no insurable interest at its inception, then the contestability period is not applicable. Second, even if the Policy is not found to be void *ab initio*, Lincoln can still bring an independent action in tort that seeks not to void the contract, but rather damages for the fraud. *See, e.g., Guarantee Trust Life Ins. Co. v. Wood*, 631 F.Supp. 15, 20–21 (N.D.Ga.1984) (finding that "[a]n independent action in tort based on fraud and deceit arising out of contract is not a suit for the violation of the contract but involves affirmance of the contract and the defrauded party may keep the benefits of the contract and maintain the action for the damages sustained by reason of the fraud") (citations omitted). Accordingly, I find that these Counts are not barred by Florida's Incontestability Statute and therefore summary judgment is not appropriate.

### F. BREACH OF CONTRACT

Plaintiff contends that Lincoln has materially breached the contract by failing to pay the death benefits on Cotton's Policy. (DE 54 at 19). This Court found, *supra* Part IV.A.2, that there is a genuine issue

of material fact as to whether the Policy is void *ab initio* for lack of an insurable interest. Accordingly, summary judgment is not appropriate on the issue of whether Lincoln breached the Policy.

### G. MUCHNICK'S SUMMARY JUDGMENT MOTION

In his Motion, Muchnick asks this Court to grant him summary judgment on the counts of fraud, negligent misrepresentation, and civil conspiracy alleged against him. (DE 72 at 4). Muchnick claims that there is no evidence that he entered into any agreement, either personally or as trustee, to sell the Policy and thus Lincoln's counterclaims against him must be dismissed. (*Id.* at 5). Furthermore, Muchnick argues that there is no tort cause of action against him after the contestability period and he is not personally liable to Lincoln under Florida law. (*Id.* at 5–6).

### 1. TORT CAUSE OF ACTION AFTER CONTESTABILITY PERIOD

Muchnick contends that under Florida law, an insurer may not bring a separate action outside Florida's contestability period for fraud or deceit. I previously stated, *supra* Part IV.E, that Lincoln is not barred by Florida's incontestability statute from bringing separate tort actions. Accordingly, Lincoln's separate claims founded on tort are not barred by Florida's contestability period. (DE 72 at 5).

### 2. MUCHNICK'S PERSONAL LIABILITY

Next Muchnick argues that he is not personally liable to Lincoln under Florida law because he owed no duty to Lincoln to investigate the truth of Cotton's representations made in the Policy Application. (*Id.* at 6). To support his contention, Muchnick cites Fla. Stat. § 736.1013(2) (2011) which provides:

> A trustee is personally liable for torts committed in the course of administering a trust or for obligations arising from ownership or control of trust property only if the trustee is personally at fault.

Contrary to Muchnick's contention, this statute actually supports Lincoln's theory that Muchnick can be held personally liable for the torts committed if Muchnick "is personally at fault." Thus, Muchnick's motion for summary judgment because he is not personally liable under Florida law is denied.

### 3. FRAUD CLAIM

██ Muchnick argues that "Count III for fraud must fail because Muchnick had no knowledge of the falsity of the alleged misrepresentations." (DE 72 at 5). There are four elements of fraudulent misrepresentation: (1) a false statement concerning a material fact; (2) the representor's knowledge the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party action in reliance on the representation. *Butler v. Yusem*, 44 So.3d 102, 105 (Fla.2010) (citing *Johnson v. Davis*, 480 So.2d 625, 627 (Fla.1985)). I find that summary judgment is not appropriate on this issue. Muchnick signed the Policy application on behalf of the Cotton trust, which he served as trustee for, to purchase the Policy at issue here. (DE 72 at 13). Although Muchnick denies knowing that any statements made therein were false, the fact that he served as Cotton's attorney for thirty years (*Id.* at 11), signed the ERA as a witness (*Id.* at 22), and signed the Trust agreement as the Trustee of the Trust (*Id.* at 12), indicates that there is a genuine issue of material fact remaining whether Muchnick knew of the falsity of the alleged misrepresentations.

### 4. NEGLIGENT MISREPRESENTATION

██ Muchnick next contends that summary judgment should be granted in

his favor on Count IV of Lincoln's Counterclaim, negligent misrepresentation. First, Muchnick asserts that he was acting gratuitously and not in a business, professional or employment capacity, and therefore he is not liable for negligent misrepresentation. Under Florida law, the elements of a negligent misrepresentation claim are: (1) the defendant made a misrepresentation of material fact; (2) the defendant either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the defendant intended to induce another to act on the misrepresentation; and (4) an injury resulted to the plaintiff who acted in justifiable reliance upon the misrepresentation. *Arnold v. McFall,* 839 F.Supp.2d 1281, 1289 (S.D.Fla.2011) (citing *Gilchrist Timber Co. v. ITT Rayonier, Inc.,* 127 F.3d 1390, 1393 (11th Cir.1997); *Baggett v. Electricians Local 915 Credit Union,* 620 So.2d 784 (Fla. 2d DCA 1993)). Under Florida law, it is not necessary for an individual to be compensated to be held liable for negligent misrepresentation. Rather, "[o]ne who is in the business of supplying a certain type of information may have the requisite pecuniary interest, even though no consideration is paid for the opinion." *Blumstein v. Sports Immortals, Inc.,* 67 So.3d 437, 441 (Fla. 4th DCA 2011). Since Muchnick served as Cotton's attorney for thirty years and was asked by Cotton to serve as trustee of the trust, I find that he possessed the requisite pecuniary interest even if he was not compensated specifically for the issuance of the Policy.

Second, Muchnick argues that "Lincoln failed to plead an essential element of a cause of action for negligent misrepresentation: That it investigated the 'information that a reasonable person in the position of the recipient would be expected to investigate.'" (DE 72 at 5–6).

However, Florida statutory and case law clearly indicates that Lincoln had no duty to investigate the information provided in the Policy. *See* Fla. Stat. § 627.404(3) (2011) ("An insurer shall be entitled to rely upon all statements, declarations, and representations made by an applicant for insurance relative to the insurable interest which such applicant has in the insured....."); *United Auto. Ins. Co. v. Salgado,* 22 So.3d 594, 601 (Fla. 3d DCA 2009) ("[A]n insurance company has the right to rely on an applicant's representations in an application for insurance and is under no duty to further investigate") (quoting *N. Miami Gen. Hosp. v. Cent. Nat'l Life Ins. Co.,* 419 So.2d 800, 802 (Fla. 3d DCA 1982)). Thus, I find that summary judgment is not appropriate for Lincoln's counterclaim for negligent misrepresentation against Muchnick.

**5. CONSPIRACY**

Lastly, Muchnick argues that summary judgment should be granted in his favor regarding Lincoln's counterclaim for conspiracy because there is no evidence that he had knowledge of the alleged misrepresentations, solicited Cotton to participate in the STOLI scheme, had any reason to believe that there was a lack of an insurable interest, had any reason to believe that the Trust was being used to conceal the alleged lack of an insurable interest, made any attempt to or participated in any transfer of the Policy, or that he knowingly concealed any information from Lincoln. (DE 72 at 6). Under Florida law, the elements of a civil conspiracy claim are: (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy. *UTC Indus., Inc. v. Presidential Fin. Corp.,* 976 So.2d 92, 94 (Fla.

3d DCA 2008). To be held liable for the acts of all co-conspirators, each co-conspirator "need only know of the scheme and assist in it in some way." *Donofrio v. Matassini,* 503 So.2d 1278, 1281 (Fla. 2d DCA 1987). I previously stated, *supra* Part IV.F.3, that there is a genuine issue of material fact whether Muchnick knew of the falsity of the alleged misrepresentations contained in the Policy Application that he signed on behalf of Cotton. Accordingly, I find that there is a genuine issue of material fact whether Muchnick conspired with Cotton and others to commit a fraud and induce Lincoln to issue the Cotton Policy.

## V. CONCLUSION

In accordance with the foregoing, it is hereby

ORDERED AND ADJUDGED that Plaintiff's Motion (DE 54) is GRANTED IN PART. It is further ORDERED AND ADJUDGED that Muchnick's Motion (DE 72) is DENIED. It is further ORDERED AND ADJUDGED that Lincoln's Motion (DE 75) is GRANTED IN PART.