[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 17-10189, 17-10415
_____

D.C. Docket Nos. 9:13-cv-80385-DLB, 9:13-cv-80730-DLB

SUN LIFE ASSURANCE COMPANY OF CANADA,

Plaintiff - Appellee,

versus

IMPERIAL PREMIUM FINANCE, LLC,

Defendant - Appellant.

SUN LIFE ASSURANCE COMPANY OF CANADA,

Plaintiff - Appellant,

versus

IMPERIAL HOLDINGS, INC.,
IMPERIAL PREMIUM FINANCE, LLC,
IMPERIAL LIFE FINANCING II, LLC,
IMPERIAL LIFE SETTLEMENTS, LLC,
IMPERIAL PFC FINANCING, LLC, et al.,

Defendants - Appellees.

—————————————————

Appeals from the United States District Court
for the Southern District of Florida

—————————————————

(September 18, 2018)

Before MARTIN, JORDAN, and WALKER,[*] Circuit Judges

WALKER, Circuit Judge:

These two appeals arise from dueling lawsuits pitting Sun Life Assurance Company of Canada ("Sun Life"), a life insurance company, against Imperial Holdings, Inc. and its affiliates ("Imperial"), a company that offers financing for insureds to pay their monthly premium payments. Both suits relate to life insurance policies that were issued by Sun Life to non-parties and that were subsequently acquired by Imperial. Imperial is therefore a stranger to the insureds, yet, as the owner of the policies, it stands to receive the life insurance benefits upon the deaths of the insureds. Sun Life alleges that Imperial's ownership of the policies violates state laws that are designed to prohibit wagering on human lives, but, more centrally, that Imperial secured the policies through an unlawful and tortious conspiratorial scheme. Imperial, for its part, contends that its acquisition and ownership of the policies is lawful, and alleges that Sun Life's attempts to

---

[*] Honorable John M. Walker, Jr., United States Circuit Judge for the Second Circuit Court of Appeals, sitting by designation.

2

interfere with its ownership of and rights under the policies, including its filing of its lawsuit here, is itself part of Sun Life's own fraudulent scheme and in breach of the policy contracts. In a series of rulings after consolidating the two cases, the United States District Court for the Southern District of Florida (Dave Lee Brannon, *Magistrate Judge*)[1] dismissed all claims in both cases, some at the pleading stage and the remainder at summary judgment. We VACATE in part, AFFIRM in part, and REMAND both cases for further proceedings.

## BACKGROUND

These appeals require us to address several issues surrounding the rights to acquire and own life insurance policies that, upon the death of the insured, distribute benefits to an entity that had no specific interest in the continuation of the insured's life. In some contexts referred to as "stranger-originated life insurance," or "STOLI," courts and lawmakers have been grappling for more than a century with such policies, juggling two competing concerns: (i) limiting the ability to wager on human life and (ii) promoting the free assignability of property rights. *See Grigsby v. Russell*, 222 U.S. 149, 155–57 (1911) (Holmes, J.) (concluding that, despite the wagering concerns, a life insurance policy is akin to

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented for a magistrate judge to conduct the proceedings in both cases, including the entry of final judgment. *See* No. 13-80385, Dkt. No. 88 (S.D. Fla. Nov. 5, 2013) (hereinafter generally, "Dkt. []").

any other property and may be sold); *see also Sciarretta v. Lincoln Nat'l Life Ins. Co.*, 778 F.3d 1205, 1207–09 (11th Cir. 2015).

The life insurance policies subject to these disputes were issued initially to senior citizens by Sun Life but were ultimately procured by Imperial through an affiliated company that offered loans to the insureds to cover their policy premiums. As to nearly all of the policies relevant to these cases,[2] Imperial's ownership came about as follows: (i) a senior citizen applied for and received a life insurance policy from Sun Life, naming as the policy beneficiary an irrevocable life insurance trust established for the benefit of his or her spouse and/or children; (ii) the insured secured non-recourse financing for the payment of the monthly policy premiums from Imperial, with the policy serving as collateral; (iii) pursuant to the loan agreements, Imperial was permitted to foreclose on and acquire the

---

[2]  Although there is some overlap in the policies that are at issue in these two actions, the set of policies in each case is distinct. Indeed, the parties dispute which specific policies are at issue in each case. Imperial contends that Sun Life's claims are limited to the 23 policies identified in Sun Life's operative complaint, Dkt. 231 ¶¶ 2–3, but Sun Life contends that "the scope of [its] complaint goes beyond those 23 policies to include at least 64 policies, as [listed] by Imperial in response to Sun Life's interrogatories." Dkt. 214 ¶ 2 (sealed).

The parties also dispute which claims are at issue in the action brought by Imperial's affiliate, Imperial Premium Finance, LLC ("IPF"). IPF identified 29 policies in its complaint, No. 13-cv-80730, Dkt. No. 1 ¶ 58 (S.D. Fla July 29, 2013), but asserted in opposition to summary judgment that its suit involves 33 policies, Dkt. 472 ¶ 16, the same contention it asserts on appeal, *see, e.g.*, No. 17-10189 Br. of Appellant at 2. Sun Life contends, however, that Imperial failed to support the existence of two of those policies (even though, we note, that one such policy, issued on the life of Robert Good, is included in Sun Life's complaint). Dkt. 494 ¶ 16. We need not resolve these disputes at this stage.

policy if the borrower defaulted; and (iv) the borrower defaulted, leading Imperial to take ownership of the insured's policy.

Once Sun Life learned of Imperial's procurement of the policies, it began to question the propriety of Imperial's ownership, both under the insurance contracts and under state and federal law. Sun Life's doubts as to the lawfulness of Imperial's acquisition and ownership of the policies led to the two competing lawsuits that are the subjects of the instant appeals.

***Sun Life's Complaint.*** Sun Life filed suit in the Southern District of Florida, alleging not just that Imperial's ownership of the policies violates state law restrictions on the wagering on human life, but, in what Sun Life refers to as the "nucleus" of its suit, that Imperial secured its Sun Life policies through a fraudulent and conspiratorial scheme. No. 17-10415 Br. of Appellant at 35. Sun Life alleged that Imperial knew that Sun Life, due principally to profitability concerns, would not have issued a life insurance policy if it knew of the applicant's predetermined intent to use premium financing or to transfer ownership of the policy to a premium finance company, such as Imperial, that would use the policies primarily as an investment vehicle. Desirous of obtaining profitable Sun Life insurance policies nonetheless, Imperial orchestrated a scheme to obtain them.

The premise of Imperial's alleged scheme rested upon the difference between policies likely to be in effect over a long period (profitable to Sun Life but

5

not to Imperial) and policies that would likely be paid out in the short term (less profitable to Sun Life but more profitable to Imperial). Under the scheme, if Imperial were the owner or beneficiary of multiple policies it could decide which ones were more likely to result in an early payout and stop paying premiums on the rest.

The alleged scheme worked as follows. "At the core of Imperial's scheme was a network of insurance producers" that served as "referral sources for [Imperial's] premium finance business" by actively "recruit[ing] senior citizens in order to originate life insurance policies that would be funded by Imperial." Dkt. 150 ("SL SAC") ¶¶ 34–36. The producers, at the direction of Imperial, *see* SL SAC ¶¶ 34–35, "solicited senior citizens through advertisements in periodicals, seminars, flyers, and personal solicitation at senior care centers, hospitals, restaurants, and clubs frequented by senior citizens." SL SAC ¶ 38. The producers would then assist the senior citizens in obtaining the requisite medical records and life expectancy reports, which the producers would submit in the first instance to Imperial for Imperial to "determine whether the proposed senior was suitable for *Imperial's* purposes." SL SAC ¶ 39 (emphasis added). If Imperial so concluded, Imperial would then direct the producers "to move forward with a formal application, . . . typically direct[ing] the producer in selecting the insurer, the insurance product, and the face amount of the policy." SL SAC ¶ 40.

6

With each life insurance application submitted to Sun Life, Sun Life required the producers and the proposed insureds to answer certain questions, including whether premium financing would be used to fund the policy. SL SAC ¶ 42. The producers falsely answered those inquiries in the negative, having full knowledge that Imperial had already made the decision internally to provide financing for the insureds' premium payments. SL SAC ¶¶ 42–44. Although Sun Life paid the producers a commission for their services, the producers were required to turn over those commissions in full to Imperial, who would then remit to the producers between 10 to 50% of the Sun Life commission. SL SAC ¶ 45.

After the policies were issued, Imperial hid from Sun Life the fact that it was making premium payments, which ultimately meant that Sun Life was unaware of Imperial's procurement of the policies until it was too late for Sun Life to contest it. Imperial accomplished this by "funnel[ing] [the] premium payments through the Bank of Utah and the Family Insurance Trust." SL SAC ¶¶ 358, 392. The Bank of Utah was a co-trustee of the irrevocable life insurance trusts that served as the ownership vehicles for each of the policies. SL SAC ¶¶ 46–47. Although at the policies' outset there was a sole trustee—generally a family member of the insured—"after the policy was issued Imperial immediately replaced the trust agreement with its own amended and restated trust agreement . . . [that] name[d] Bank of Utah as the co-trustee, and virtually eliminated any discretion on the part

7

of the original trustee to manage the trust assets." SL SAC ¶ 47. Imperial would deposit the funds for the insureds' policy payments into an account created at the Bank of Utah (in the name of the Family Insurance Trust), which would then issue the payments to Sun Life, thereby concealing Imperial's involvement. SL SAC ¶ 48.

The Imperial loans were structured such that the borrowers would generally default after two years, allowing for Imperial to foreclose on the loans and take ownership of the insurance policies. Imperial would then "submit[] a policy ownership and beneficiary change request form to Sun Life," which would be "the first time that Imperial revealed its interest in the policy [to Sun Life]." SL SAC ¶ 67. This was no accident, in that it meant Imperial arrived on the scene and acquired the policies after the expiration of the contractual two-year period during which Sun Life could "contest" the policies. *See* SL SAC ¶¶ 53, 67; *see also* Fla. Stat. § 627.455 (requiring that all insurance contracts "provide that the policy shall be incontestable after it has been in force during the lifetime of the insured for a period of 2 years from its date of issue [with certain exceptions]"). Consequently, Imperial's fraudulent scheme was complete: Sun Life was stuck with less profitable investor-owned policies that it specifically sought to avoid.

In light of these allegations, Sun Life brought seven claims: (i) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

8

§ 1962 (a), (c); (ii) RICO conspiracy, 18 U.S.C. §1962(d); (iii) fraud; (iv) aiding and abetting fraud; (v) civil conspiracy to commit fraud; (vi) tortious interference with contractual relations; and (vii) declaratory judgment that the policies are void *ab initio*.[3]

***Imperial Premium Finance, LLC's Complaint***.    Imperial, for its part, not only denied Sun Life's allegations regarding the lawfulness of Imperial's acquisition and ownership of the Sun Life policies, it also (through its subsidiary, Imperial Premium Finance, LLC ("IPF")) filed suit in the Southern District of Florida, alleging in relevant part that Sun Life's efforts to challenge Imperial's ownership of the policies was (i) in breach of the policy agreements and (ii) itself part of Sun Life's own fraudulent scheme.[4]

IPF's contract claim alleged that Sun Life breached two provisions in the policy agreements.  *First*, IPF alleged that Sun Life breached the policies' "incontestability clause," which provides:

> After this Policy has been in force during the lifetime of the [i]nsured for a period of two years from its Issue date, we [Sun Life] cannot contest it except for non-payment of [p]remiums.

---

[3] The first six counts were brought only against Imperial Holdings, Inc., and the seventh count for a declaratory judgment was brought against all defendants.

[4] IPF also brought claims for declaratory judgment, breach of the covenant of good faith and fair dealing, and promissory estoppel.  *See* No. 13-cv-80730, Dkt. No. 1 (S.D. Fla. July 29, 2013). IPF voluntarily dismissed its declaratory judgment and promissory estoppel claims prior to summary judgment.  *See* Dkt. 194, 212.  The district court dismissed IPF's implied covenant claim at summary judgment.  IPF does not appeal this ruling.

Dkt. 472-1 at 14.   Imperial not only invoked the incontestability clause as a complete defense to Sun Life's affirmative claims (which were brought more than two years after issuance of the policies), it also contended (through IPF's lawsuit) that Sun Life's challenges to the policies breached the same clause entitling IPF to damages.

*Second*, IPF contended that Sun Life breached the policies' "rights-and-privileges clause," which provides:

> You [the policyowner] have the sole and absolute power to exercise all rights and privileges under [the Policy] without the consent of any other person.

Dkt. 472-1 at 16.  IPF ultimately contended that Sun Life interfered with Imperial's "rights and privileges" under the policies in four ways:  (i) refusing to honor requests to name Imperial as a policyowner and beneficiary; (ii) failing to provide Imperial with timely notice that a policy was lapsing; (iii) interfering with Imperial's ability to assign rights under the policies; and (iv) contesting the policies outside of the contestable period.  *See* Dkt. 471 at 4.   IPF alleged that Imperial was harmed by these breaches because they raised concerns about the propriety of Imperial's ownership of the policies, which, in several ways, lowered the policies' value and led to increased costs.  Most relevant, IPF contended that the "cloud" placed over the policies by Sun Life's actions prohibited Imperial from

10

using the policies as collateral for certain credit facilities.  *See* No. 17-10189 Br. of Appellant at 9, 14, 33.

IPF's fraud claim alleged principally that Sun Life falsely told the policy owners that it would not contest policies beyond the two-year contestable period despite its hidden intent to contest beyond that period the validity of any policy financed or acquired by Imperial (or any other premium finance company).  IPF also asserted a fraudulent omission theory, contending that Sun Life represented in post-contract communications that the Imperial-owned policies were in force, active, valid, and incontestable after two years, while omitting its true views to the contrary.  IPF alleged that Sun Life intended by these misrepresentations to induce "Imperial to continue to pay premiums that Sun Life intended to collect as excess profits and has been scheming to forever keep."  No. 13-cv-80730, Dkt. No. 1 ¶ 115 (S.D. Fla. July 29, 2013).

The district court, in a series of rulings after consolidating the two cases, dismissed all the claims in each action.  We briefly summarize the relevant rulings.

***Dismissal of Sun Life's Claims***.  In a December 2014 ruling from the bench, the district court dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6) the following of Sun Life's claims: (i) RICO conspiracy; (ii) aiding and abetting fraud; (iii) fraud conspiracy; (iv) tortious interference with contractual

relations; and (v) declaratory judgment.[5]  Dkt. 191–92.  In a February 2015 ruling on Imperial's motion for summary judgment, again from the bench, the district court dismissed Sun Life's remaining claims for (i) RICO and (ii) fraud, concluding that those claims are barred by the policies' incontestability clause. Dkt. 293 at 18:14–19:21.  Sun Life appeals the dismissal of each of its seven claims.

***Dismissal of IPF's Claims***.  In a June 2016 ruling from the bench, the district court dismissed under Fed. R. Civ. P. 12(c) one theory of IPF's breach of contract claim, specifically, that Sun Life's filing of a declaratory judgment claim breached the incontestability clause.[6]  Dkt. 441–42.  In a September 2016 written ruling, the district court granted Sun Life's motion for summary judgment, dismissing each of IPF's remaining claims, including breach of contract and fraud. *See Sun Life Assurance Co. of Can. v. Imperial Holdings Inc.*, 2016 WL 10565034 (S.D. Fla. Sept. 22, 2016).  IPF appeals the dismissal only of its breach of contract and fraud claims.

---

[5] The district court had previously granted Imperial's motion to dismiss an earlier version of Sun Life's complaint, principally because Sun Life failed to plead with particularity an agency relationship between Imperial and its producers.  Dkt. 142.

[6] The district court had previously denied Sun Life's motion to dismiss IPF's complaint under Fed. R. Civ. P. 12(b)(6), rejecting Sun Life's assertion that it was absolutely immune from IPF's suit under Florida's litigation privilege, *see infra* at 37–42.  Dkt. 291.  Sun Life sought an immediate appeal to this Court under the collateral order doctrine, but we dismissed the appeal for lack of jurisdiction.  *See Sun Life Assurance Co. of Can. v. Imperial Holdings, Inc.*, No. 15-10843 (11th Cir. Dec. 17, 2015) (unpublished).

## DISCUSSION

Because all of the claims on appeal by both sides were variously dismissed on motions to dismiss, Fed. R. Civ. P. 12(b)(6), motions for judgment on the pleadings, Fed. R. Civ. P. 12(c), or motions for summary judgment, Fed. R. Civ. P. 56, we review each *de novo*. *Jara v. Núñez*, 878 F.3d 1268, 1271 (11th Cir. 2018) (12(b)(6)); *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014) (12(c)); *Baas v. Fewless*, 886 F.3d 1088, 1091 (11th Cir. 2018) (56).

The standards for reviewing decisions on motions to dismiss and motions for judgment on the pleadings are the same: "whether the count stated a claim for relief." *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 n.8 (11th Cir. 2002). To state a claim, a "complaint must include 'allegations plausibly suggesting (not merely consistent with)' the plaintiff's entitlement to relief." *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1334 (11th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). In our review, we must accept all facts in the complaint as true and view those facts in the light most favorable to the plaintiff. *See Jara*, 878 F.3d at 1271–72; *Perez*, 774 F.3d at 1335. To prevail at summary judgment, the movant must demonstrate that there is "no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "might affect the outcome of the suit under the governing law." *Baas*, 886

F.3d at 1091 (internal quotation marks omitted).    In reviewing the summary judgment record, we must view the "submitted evidence in the light most favorable to the non-moving party." *Id*.

Turning to the merits, we now explain our decisions to affirm in part, vacate in part, and remand both causes for further proceedings.

## I.    Law Governing the Policies

Prior to separately addressing the parties' claims, we need to resolve a dispute over which states' laws should be applied in interpreting the relevant policy agreements.    Florida law, which controls our choice-of-law analysis, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), provides that a contract must be interpreted according to the law of the state of the contract's execution.    *See State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So.2d 1160, 1163 (Fla. 2006). Determining a contract's state of execution is generally a "fact-intensive" analysis that looks to the location of the "last act necessary to complete [the] contract," which is most often the offeree's communication of its acceptance to the offeror. *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1092–93 (11th Cir. 2004).    In dismissing Sun Life and IPF's claims, the district court conducted no such choice-of-law analysis.    Sun Life asserts this was in error, but we disagree.

Sun Life contends that the district court was required, under Florida's choice-of-law rules, to interpret the policies at issue under the laws of the myriad states in which the individual life insurance policies were executed. In doing so, Sun Life points to *American United Life Insurance Co. v. Martinez*, 480 F.3d 1043 (11th Cir. 2007), where we applied Florida's choice-of-law rules to interpret incontestability clauses in life insurance contracts executed outside of Florida. *Id.* at 1059–60. There, we affirmed dismissal of the insurers' claims only after determining which state's law applied to each policy and how each such state assesses the impact of incontestability clauses on the claims. *Id.* at 1059–66. For example, although Ohio law on incontestability clauses precluded one of the insurer's claims, *id.* at 1061–62, the same was not true as to California law, which had a potentially relevant exception allowing for circumvention of an incontestability clause, *id.* at 1063–64. Sun Life contends that the district court was required to follow *Martinez* and determine which state's law applied to each life insurance policy and then to subsequently apply that law to the claims in question.

Sun Life's issue with the district court suffers from a fatal defect: unlike the insurers in *Martinez*, Sun Life neither provided information regarding contract formation in its pleadings that would have enabled the district court to conduct a choice-of-law analysis nor informed the district court which states' laws it believed

15

applied.[7]   Consequently, Sun Life waived its opportunity for the district court to apply non-Florida law to the policies at issue.

Under our precedents, a party waives its opportunity to rely on non-forum law where it fails to timely provide—typically in its complaint or the first motion or response when choice-of-law matters—the sources of non-forum law on which it seeks to rely.  *See Stone v. Wall*, 135 F.3d 1438, 1442 (11th Cir. 1998) (per curiam) ("Foreign law is a fact to be pleaded and proved; and when the contrary is not alleged, the law of the sister state will be assumed to be the same as Florida law.") (citing *Collins v. Collins*, 36 So.2d 417, 417 (Fla. 1948)); *see also Bethell v. Peace*, 441 F.2d 495, 497 (5th Cir. 1971) ("[T]he party relying on foreign law must plead and prove it. [Plaintiff] . . . made no allegations in her pleadings, nor any showing at any point in the litigation, as to what is the relevant [foreign] law.  In the absence of any such showing, the district court was entitled to assume that [foreign law] was the same as Florida law." (citing *Movielab, Inc. v. Davis*, 217 So.2d 890, 891 (Fla. 3d DCA 1969)).[8]

---

[7] The *Martinez* plaintiff, unlike Sun Life here, attached to its complaint the relevant insurance applications, which specifically noted the location where the applications were signed. *See, e.g.*, No. 04-cv-61143, Dkt. No. 33 at 170–74 (S.D. Fla. filed Mar. 15, 2005) (Gerald Metoyer insurance application, noting it was signed in Riverside, California); *see Martinez*, 480 F.3d at 1063 (applying California law to Metoyer's insurance policy because "[h]e signed the application in California").

[8]  We are bound by Fifth Circuit decisions issued prior to September 30, 1981.  *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Sun Life did not plead non-forum law. Its complaint is not just devoid of a stated intention to rely on non-Florida law, it also contains almost no facts from which the court could have determined which state's law might have applied to each policy. To be sure, Sun Life's complaint listed detailed facts about the formation of many of the policies at issue, at times in granular detail, *see, e.g.*, SL SAC ¶¶ 55–61, but it said very little as to where any of the policy contracts were executed, *see generally* SL SAC ¶¶ 55–348, which is the relevant inquiry under Florida law. Sun Life also never proffered non-forum law in opposition to IPF's claims.

Not only did Sun Life fail to plead non-forum law, it seemed quite content early in the litigation with the application of Florida law to each of the policies: its primary argument to the district court in support of its declaratory judgment claim was that the policies were void *ab initio* because they lacked an "insurable interest" under Florida's insurable interest statute. *See* Dkt. 61 at 18–19. At the time, Sun Life likely viewed this as sound strategy, evidenced by its citations to numerous federal district courts applying Florida law to conclude that life insurance policies originated by strangers to the insured lacked the statutorily required "insurable interest."

Despite the silence of its pleading as to non-forum law, Sun Life contends that it sufficiently raised the issue to the district court by referring to a choice-of-

law analysis in opposition to Imperial's dispositive motions.  It relies on the fact that it told the district court a choice-of-law analysis was "premature" at the motion to dismiss stage in relation to its declaratory judgment claim, Dkt. 61 at 19–20; Dkt. 160 at 3 n.1; *see also* Dkt. 182-1 at 2–3, and that it raised the issue again in opposition to Imperial's summary judgment motion, asserting that it was Imperial's burden to "come forward with the authority" necessary for the application of out-of-state law, Dkt. 215 at 6–7 (sealed).

We disagree that Sun Life's general references to a choice-of-law analysis in opposition to Imperial's dispositive motions sufficiently raised the issue with the district court.  Sun Life is the party now seeking the application of non-forum law, yet it repeatedly abdicated its responsibility to proffer the information necessary for the choice-of-law analysis to take place.  This is not in accord with the steps we require to raise non-forum law before a district court.  *See Stone*, 135 F.3d at 1442; *Bethell*, 441 F.2d at 497.  We also disagree with Sun Life that it was "premature" for the district court to have conducted a choice-of-law analysis at the motion to dismiss stage.  *Cf. Martinez* (conducting choice-of-law analysis at the 12(b)(6) stage).  The responsibility for any failure by the district court to apply non-forum law rests squarely with Sun Life and not the district court.

18

For the foregoing reasons, we conclude that Sun Life waived its opportunity to rely on non-forum law to interpret the policies at issue. Consequently, we interpret the relevant policies in these cases pursuant to Florida law.

## II. Sun Life's Claims

Sun Life appeals the dismissal of each of its claims, two of which (RICO and fraud) were dismissed at summary judgment and the rest (RICO conspiracy, aiding and abetting fraud, fraud conspiracy, tortious interference with contractual relations, and declaratory judgment) dismissed on the pleadings. We affirm the dismissal of Sun Life's fraud conspiracy and declaratory judgment claims, but we vacate the dismissal of Sun Life's remaining claims.

### a. Count I (RICO) & Count III (Fraud)

Sun Life's claims for RICO and common law fraud depend on the same alleged fraudulent scheme, discussed *supra* at 6–8.[9] To summarize, Sun Life contends that Imperial orchestrated an elaborate scheme to procure Sun Life policies despite knowing that Sun Life did not want its policies owned by companies like Imperial, which intended to use the policies solely as investment vehicles. Using its network of producers, Imperial recruited senior citizens to apply for Sun Life insurance policies and told them that Imperial would finance the premium payments. Knowing that Sun Life would reject such an arrangement,

---

[9] The specifically alleged predicate acts underlying Sun Life's RICO claim are mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. SL SAC ¶ 360.

19

Imperial directed the producers to falsely represent on the application forms (which they transmitted to Sun Life through United States mail or interstate wire) that the insureds did not plan to acquire premium financing or to transfer their policies to the secondary market.  Sun Life issued the policies which it would not have done had it known of the misrepresentations on the applications.

Aware that Sun Life could challenge the validity of the policies during the contractual two-year contestable period that followed their issuance, however, Imperial deceptively hid its involvement during that period, principally by funneling premium payments to Sun Life through the Bank of Utah and the Family Insurance Trust as loans.  After the expiration of the contestable period, Imperial forgave the insureds' debts to induce the insureds to transfer ownership of the policies to Imperial.  Sun Life, now effectively time-barred by the incontestability clause from contesting the validity of the policies, was stuck with the investor-owned policies that it actively sought to avoid.  Sun Life was harmed by this scheme, it claims, because sophisticated investors such as Imperial can manipulate the value of the policies in ways that Sun Life knows a typical policy consumer does not, which makes the policies less profitable to Sun Life.

The district court dismissed Sun Life's RICO and fraud claims bottomed on the foregoing scheme at summary judgment, concluding that those claims are time-barred by operation of the incontestability clause.  On appeal, Imperial defends the

20

district court's conclusion.[10] The issue here is therefore straight-forward: does the incontestability clause bar Sun Life from asserting its RICO and fraud claims?[11] We conclude that it does not and vacate the district court judgment to the contrary.

As discussed, the incontestability clause provides that:

> After this Policy has been in force during the lifetime of the [i]nsured for a period of two years from its Issue date, we [Sun Life] cannot contest it except for non-payment of [p]remiums.

Dkt. 472-1 at 14. As Sun Life does not dispute that it brought its RICO and fraud claims more than two years after issuance of each of the relevant policies, the only issue is whether, through those claims, Sun Life "contest[s]" the policies.

Imperial argues that any fraud-based claim that is related to the policies is a "contest[ing]" of the policies and is therefore barred by the incontestability clause. In fact, Imperial goes so far as to contend that the incontestability clause bars Sun

---

[10] Imperial does not contend, as it did below, *see* Dkt. 201 at 6–21, that Sun Life's RICO and fraud claims are otherwise deficient. *See* No. 17-10415 Br. of Appellees at 21–29.

[11] Sun Life also contends that Imperial Holdings, Inc. ("IHI") (the only defendant named in Sun Life's RICO and fraud claims) lacks standing to invoke the incontestability clause as a defense to Sun Life's claims because IHI is not a record owner of any of the policies. Although true that IHI is not a record owner, it is also undisputed that each record owner is itself an IHI subsidiary or affiliate. *See* Dkt. 200-61; SL SAC ¶¶ 13–20; Dkt. 193 ¶¶ 13–20. To the extent these subsidiaries or affiliates are agents of IHI, IHI would have standing to enforce their contractual rights. *See Nardi v. Cont'l Nat'l Bank*, 559 So.2d 307, 309 (Fla. 3d DCA 1990). Imperial (through its affiliate, IPF), later (after Sun Life's RICO and fraud claims were dismissed) introduced unrebutted evidence that each of the policy owners are agents of IHI, *see* Dkt. 472-15 ¶ 3(i), but Sun Life ultimately disputed that assertion. *Compare* Dkt. 472 ¶ 33 n.5, *with* Dkt. 494 ¶ 33. As we conclude that the incontestability clause is not a bar to Sun Life's RICO and fraud claims against IHI, we need not resolve this dispute.

21

Life from "mak[ing] the Policies the subject of a legal case."[12]   No. 17-10415 Br. of Appellees at 26–27.  Sun Life disagrees, contending that an insurer "contests" a life insurance policy only where it seeks rescission of the policy as a remedy, which ultimately means a release from the obligation to pay benefits upon the death of the insured (or a repayment of death benefits already distributed).  Here Sun Life argues that it does not seek to rescind any of the policies through its RICO and fraud claims, but that these claims seek only to recover lost profits attributable to the fact that the policies are investor-owned rather than consumer-owned.  We agree with Sun Life.

Although Florida law strictly construes incontestability clauses against untimely claims to void life insurance policies, *see Bankers Sec. Life Ins. Soc. v. Kane*, 885 F.2d 820, 822 (11th Cir. 1989), Florida courts have not addressed whether an incontestability clause may bar an insurer's fraud-based claim that seeks a remedy other than a voiding of the policy.[13]   Nevertheless, this is not the

---

[12] This position is certainly incorrect.  *See, e.g.*, *Allen v. Aetna Life Ins. Co.*, 563 F.2d 1240, 1241 (5th Cir. 1977) (per curiam) ("An incontestable clause does not bar the insuror from proving that the loss was not covered by the terms of the policy.").

[13] Contrary to the district court's analysis, we are not controlled on this question by *Martinez*. There, we concluded that Ohio, West Virginia, Massachusetts, and Illinois law would each interpret the incontestability clauses at issue to bar the plaintiffs-insurers' fraud-based claims in those cases.  480 F.3d at 1059–66.  *Martinez* is inapposite for at least two reasons:  (i) we had no occasion in *Martinez* to address Florida law, which governs our review of the policies here, *see supra* at 14–18; and (ii) regardless, we see no indication that we were confronted in *Martinez* with the specific argument Sun Life poses here:  that where a life insurer seeks non-rescission damages, it does not seek to "contest" the policy.

first time we have confronted the issue.  In *Kane*, life insurance companies filed suit beyond the contestable period seeking to void policies on the ground that the insured fraudulently misrepresented his criminal history in his applications.  885 F.2d at 820–21.    As relevant here, the insurers argued that even if the incontestability clause barred their contract claims, the clause could not bar their fraud claims, citing *Guarantee Trust Life Insurance Co. v. Wood*, 631 F. Supp. 15 (N.D. Ga. 1984), which stood for just that proposition (under Georgia law).  *Id.* at 822.    Although we rejected the argument, we did not disagree with *Wood*, but rather concluded that it was inapposite on the facts before us given that the insurers' fraud claims in *Kane*, as opposed to those in *Wood*, sought to void the life insurance policies: "[a]lthough *Wood* may have involved facts that justified the court's ruling, in this case a fraud suit would merely provide a different means to challenge the validity of the insurance contract."  *Id.*  Although it was *dictum*, we envisioned in *Kane* that, under Florida law, a life insurance policy's incontestability clause would not bar a fraud claim that did not seek to void the policy.  And at least one court has relied on *Kane* to conclude that Florida's incontestability statute does not bar fraud claims that, like Sun Life's, "seek[] not to void the contract, but rather damages for the fraud."  *Sciaretta v. Lincoln Nat'l. Life Ins. Co.*, 899 F. Supp. 2d 1318, 1328 (S.D. Fla. 2012), *aff'd*, 778 F.3d 1205. We think this is the correct approach.

23

As a textual matter, a lawsuit seeking damages without asking to rescind a life insurance policy cannot reasonably be construed as "contest[ing]" "th[e] *Policy*," Dkt. 472-1 at 14 (emphasis added), which would remain fully in force despite the entry of judgment on a fraud claim (such as Sun Life's) under the exact terms on which it was executed. Further, to allow damages without rescinding the death benefit obligation does not significantly impact the rationale behind incontestability clauses. Justice Holmes noted nearly a century ago that the "object of the [incontestability] clause is plain and laudable—to create an absolute assurance of the benefit." *Nw. Mut. Life Ins. Co. v. Johnson*, 254 U.S. 96, 101 (1920). That the prevailing function of an incontestability clause is to remove from any doubt a life insurer's obligation to pay death benefits (following a reasonable period to allow the insurer to investigate) helps explain why Florida law has singularly focused its application of incontestability clauses on efforts to void policies. *See Kane*, 885 F.2d at 821 (a principal "purpose of [Florida's incontestability] statute is to . . . protect[] consumers from untimely efforts to *void policies*." (emphasis added) (citing *Prudential Ins. Co. of Am. v. Prescott*, 176 So. 875 (Fla. 1937))); *Allstate Life Ins. Co. v. Miller*, 424 F.3d 1113, 1115 (11th Cir. 2005) ("Florida's appellate courts have uniformly held that once the incontestability clause becomes effective, insurers are barred from attempting *to rescind or cancel* the insurance policy based on allegations that the insured

24

engaged in fraud or misrepresentation." (emphasis added)); *Allstate Life Ins. Co. v. Fox*, 700 So.2d 49, 49–50 (Fla. 5th DCA 1997) (incontestability clauses "prevent[] the insurer from raising [fraud] *as a defense to payment of a claim*") (emphasis added); *cf. Prescott*, 176 So. at 878 (incontestability clauses give "the insured a guaranty against expensive litigation *to defeat his policy*" (emphasis added)).

Where, as here, a life insurer sues alleging that it was fraudulently induced to enter into a life insurance contract but does not seek any relief that would call into question the continuing viability of the policy, we do not think that the insurer "contest[s]" that policy. Consequently, we vacate the dismissal of Sun Life's RICO and fraud claims to the extent those claims seek a remedy other than effective rescission of the policies.

### b. Count II (RICO Conspiracy) & Count V (Fraud Conspiracy)

Sun Life alleged that Imperial conspired with the producers, as well as the Bank of Utah, and the Family Insurance Trust, to commit RICO predicate acts and common law fraud. SL SAC ¶¶ 367, 390. The alleged conduct underlying both conspiracy claims was the submission of fraudulent life insurance applications to Sun Life. *See* SL SAC ¶¶ 375, 391.[14] The district court granted Imperial's motion to dismiss both claims on the ground that Sun Life failed to plead sufficient facts to establish a plausible conspiracy. Dkt. 192 at 56–57. We affirm the dismissal of

---

[14] As with its RICO claims, the underlying predicate acts supporting Sun Life's RICO conspiracy claim are mail fraud, 18 U.S.C § 1341, and wire fraud, 18 U.S.C. § 1343. SL SAC ¶ 368.

Sun Life's fraud conspiracy claim but vacate the dismissal of Sun Life's RICO conspiracy claim.

"[A] conspiracy requires a meeting of the minds between two or more persons to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc) (internal citations omitted). "[W]here a conspiracy claim alleges that two or more parties agreed to commit fraud, the plaintiff must . . . plead this act with specificity." *Martinez*, 480 F.3d at 1065.

Sun Life's fraud conspiracy claim does not meet these criteria. Sun Life's claim that Imperial conspired with the producers to commit fraud fails because Sun Life did not plausibly allege that the producers and Imperial are independent entities that were capable of conspiring to commit common law fraud as alleged by Sun Life. Sun Life repeatedly alleged that the producers were agents (or even employees) of Imperial in relation to their submission of life insurance applications to Sun Life, *see* SL SAC ¶¶ 32, 34, 35, 54, 68, 79, 91, 108, 122, 134, 147, 158, 172, 188, 199, 212, 223, 234, 247, 258, 263, 273, 284, 297, 312, 326, 339, 348, 360, 382,[15] and "it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself," *McAndrew*, 206 F.3d at 1036

---

[15] Indeed, Sun Life argued at summary judgment that "[d]iscovery has revealed overwhelming evidence that the producers acted as Imperial's agents in submitting the life insurance applications." Dkt. 215 at 2 (sealed).

26

(discussing federal law).[16]  Sun Life's fraud conspiracy claim cannot survive.[17]

The same analysis does not apply, however, to Sun Life's claim for RICO conspiracy.  *See* 18 U.S.C. § 1962(d).  We have concluded that the principle discussed in *McAndrew*, known as the "intracorporate conspiracy doctrine," does not apply to civil claims for RICO conspiracy.  *Kirwin v. Price Commc'ns Corp.*, 391 F.3d 1323, 1326–27 (11th Cir. 2004) ("[J]ust as the intracorporate conspiracy doctrine cannot shield a criminal conspiracy from prosecution under the federal criminal code, the doctrine cannot shield the same conspiracy, alleging the same criminal wrongdoing, from civil liability arising under [18 U.S.C. § 1962(d)].").  And we disagree with Imperial's attacks on the merits of Sun Life's RICO conspiracy claim, specifically, that Sun Life did not plead (i) an agreement between Imperial and the producers, and (ii) racketeering activity.  No. 07-10415 Br. of Appellees at 30–35; *see Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293–96 (11th Cir. 2010).

---

[16] Sun Life contends that it was free to plead a non-agency theory in the alternative.  No. 17-10415 Reply Br. of Appellant at 22–23 (citing Fed. R. Civ. P. 8(d)).  While true, it did not so plead.  Rule 8(d)(2) requires that "alternative statements" be "set out" in the pleading, a requirement that is generally met through "'either-or' propositions" or "'if-then' allegations," Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1282 (3d ed. Apr. 2018), which Sun Life did not include.  Indeed, in nearly each of its paragraphs under its conspiracy counts Sun Life seems to reaffirm its allegation that the producers were agents of Imperial, repeatedly referring to Imperial and "*its* . . . producers."  SL SAC ¶¶ 367–75, 390, 392 (emphasis added).

[17] Sun Life's claim that Imperial conspired with the Bank of Utah and the Family Insurance Trust also fails because the complaint contains no non-conclusory allegations supporting a plausible agreement between those parties specifically to submit false applications to Sun Life, which is the only fraudulent act alleged in Sun Life's conspiracy counts.  *See Martinez*, 480 F.3d at 1067–68 (plaintiff must plead that the "parties agreed to commit fraud . . . with specificity").

27

First, Sun Life's complaint easily permits the inference that Imperial and the producers entered into an agreement to effectuate Imperial's fraudulent plan. As discussed, the complaint contains myriad details of Imperial's interaction with and direction of the producers with respect to Imperial's alleged scheme, *see, e.g.*, SL SAC ¶¶ 55–65, 68, which included Imperial compensating the producers for their knowing submission of fraudulent applications to Sun Life, SL SAC ¶ 42–45. In light of those allegations, an agreement between Imperial and the producers is certainly plausible.

Second, Sun Life pled RICO predicate racketeering acts: the commission of mail and wire fraud, 18 U.S.C. §§ 1341, 1343, which "[b]oth . . . require that a person (1) intentionally participate[d] in a scheme or artifice to defraud another of money or property, and (2) use[d] or 'cause[d]' the use of the mails or wires for the purposes of executing the scheme or artifice." *United States v. Ward*, 486 F.3d 1212, 1222 (11th Cir. 2007). Sun Life met its burden by alleging that the producers used the United States mail and interstate wire to submit life insurance applications to Sun Life that contained several misrepresentations that induced Sun Life's issuance of the policies. For example, Sun Life alleged that the producers misrepresented that the insureds did not intend for policy premiums to be financed

28

through a loan "now or in the future." *See, e.g.*, SL SAC ¶ 62.[18]  But, as Sun Life also alleged, the producers knew the contrary to be true.  *See, e.g.*, SL SAC ¶¶ 57–61.  And Sun Life's reliance on those misrepresentations is supported by the allegation that Sun Life framed the relevant application questions precisely to avoid issuing premium-financed policies or policies intended at the outset for the secondary market.  *See* SL SAC ¶¶ 5, 30.  Finally, Sun Life alleged the damages it faced by issuing less profitable premium-financed policies.  SL SAC ¶¶ 364–66.

Consequently, we conclude that the district court properly dismissed Sun Life's fraud conspiracy claim but that it erred in dismissing Sun Life's RICO conspiracy claim to the extent such claim alleges a conspiracy between Imperial and the producers.

### c.  Count IV (Aiding and Abetting Fraud)

Florida courts have for some time assumed without deciding that a cause of action exists for aiding and abetting fraud, "presum[ing] that [the claim] has three elements:  (1) the existence of an underlying fraud; (2) that the defendant had knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the commission of the fraud."  *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1097–98 (11th Cir. 2017) (internal quotation marks and alterations

---

[18] Imperial argues that the applications did not actually contain misrepresentations made by the producers to Sun Life. No. 17-10415 Br. of Appellees 34–37.  But, its argument depends on material outside of the pleadings, which may not be considered at the Rule 12(b) stage.

omitted).[19]  Assuming the cause of action exists, the district court concluded that Sun Life failed to state an aiding and abetting fraud claim under Rule 12(b)(6) because it did not plead "how the Defendant had knowledge of the alleged fraud." Dkt. 192 at 57.  We disagree with that conclusion.

For reasons that have largely been discussed, Sun Life adequately pled each element of an aiding and abetting fraud claim.  First, we have already identified the allegations supporting the plausibility of an underlying fraud of someone other than Imperial (the producers).  *See supra* at 28–29.  Second, Sun Life has alleged that Imperial knew about the producers' fraudulent application statements.  *See* SL SAC ¶ 63.  And third, Sun Life has alleged that Imperial provided "substantial assistance" to the producers' submission of the fraudulent applications.[20]  The alleged "substantial assistance" is best illustrated by the fact that, prior to directing the producers to submit applications to Sun Life, Imperial reviewed the applicants' medical records to determine if the policies were ones that Imperial would want to finance, *see, e.g.*, SL SAC ¶¶ 39, 57, and that Imperial compensated the producers for each policy that Sun Life ultimately issued as a result of Imperial's scheme, *see* SL SAC ¶ 45.  Consequently, Sun Life alleged not only that Imperial had

---

[19] Imperial does not argue that there is no aiding and abetting fraud claim under Florida law, and we therefore also assume its existence.  *See Lamm v. State St. Bank & Trust*, 749 F.3d 938, 950 n.9 (11th Cir. 2014).

[20] Imperial does not argue (as it does as to Sun Life's fraud conspiracy and tortious interference with contractual relations claims) that Sun Life's aiding and abetting fraud claim fails in light of Sun Life's allegations that the producers were agents of Imperial.

30

knowledge of the producers' fraud but that it provided "substantial assistance" to the fraud and that it directed and incentivized it.

Plainly, Sun Life sufficiently pled an aiding and abetting fraud claim, and we accordingly vacate the district court's ruling to the contrary.

### d. Count VI (Tortious Interference with Contractual Relations)

Sun Life alleged that the producers that conspired with Imperial to defraud Sun Life were simultaneously under contract with Sun Life, and that those contracts prohibited the producers from, *inter alia*, making fraudulent statements on Sun Life insurance applications. SL SAC ¶¶ 395–96. Sun Life therefore alleged that Imperial tortiously interfered with these contracts, by, most notably, directing the producers to submit fraudulent applications to Sun Life. The elements of a Florida law tortious interference with contractual relations claim are: (i) the existence of a contract; (ii) the defendant's knowledge thereof; (iii) the defendant's intentional and unjustified procurement of a breach thereof; and (iv) damages. *See Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998). The district court granted Imperial's motion to dismiss the claim, concluding that: "I don't see that specific facts have been pled pursuant to Rule 9(b) as to how the Defendant [Imperial] knew of the existence of the alleged producer contracts, and how Defendant [Imperial] knew that the producers were in breach of those contracts." Dkt. 192 at 57. We disagree.

31

Imperial raises three arguments in support of the dismissal of Sun Life's tortious interference claim:  (i) Sun Life failed to plead Imperial's knowledge of the producers' contracts with Sun Life; (ii) Sun Life failed to plead that Imperial interfered with those contracts; and (iii) Sun Life alleged that the producers are agents of Imperial, and a principal cannot tortiously interfere with its agents' contracts.  We are unpersuaded.

Imperial's first two arguments can be quickly set aside.  Sun Life expressly alleged that Imperial knew of the producers' contracts with Sun Life.  SL SAC ¶ 397.  Contrary to the district court's conclusion, Sun Life need not have pled Imperial's knowledge of the relevant contracts with specificity, even assuming Rule 9(b) applies.  *See* Fed. R. Civ. P. 9(b) ("In alleging fraud . . .  knowledge . . . may be alleged generally.").  Sun Life also pled Imperial's interference with the relevant contracts.  As discussed above, Sun Life alleged that Imperial's scheme depended on (and, significantly, incentivized) the producers' submission of fraudulent statements on Sun Life's application forms, acts which allegedly breached the producers' contracts with Sun Life.  SL SAC ¶ 396.

Finally, we reject at this stage Imperial's third argument that Imperial could not have tortiously interfered with the producers' contracts in light of Sun Life's allegations that the producers were Imperial's agents.  Even if there are instances in which a principal cannot tortiously interfere with its agent's contracts, the agent

32

must have been "acting within his capacity and scope as an agent" when executing the contract for the rule to apply. *See Cedar Hills Props. Corp. v. E. Fed. Corp.*, 575 So.2d 673, 676 (Fla. 1st DCA 1991). Although Sun Life pled that the producers were agents of Imperial for purposes of submitting insurance applications to Sun Life (thereby precluding the core of Sun Life's fraud conspiracy claims), it is not readily apparent that Sun Life also alleged that the producers were acting as Imperial's agents when they contracted with Sun Life. Sun Life did not allege that Imperial directed the producers to enter into the contracts with Sun Life, or that the producers entered into those contracts for Imperial's benefit. *See Ilgen v. Henderson Props., Inc.*, 683 So.2d 513, 515 (Fla. 2d DCA 1996).[21]

Consequently, we conclude that, at this stage, Sun Life has adequately pled its tortious interference with contractual relations claim, and we vacate the district court's ruling to the contrary.

---

[21] We note, however, that certain of Sun Life's allegations suggest that the producers were employees of Imperial when they contracted with Sun Life. And Sun Life states in its brief on appeal that at least some of the producers entered into the relevant contracts with Sun Life "in the course and scope of their employment *with Imperial*." No. 17-10415 Br. of. Appellant at 47 (emphasis added). To the extent any of the producers' contracts were executed within the scope of the producers' employment (or agency) with Imperial, we think Sun Life will be hard pressed to make out its tortious interference claim as to that contract (thought it may have a breach of contract claim). Nevertheless, this dispute is properly the subject of subsequent stages of this litigation.

### e. Count VII (Declaratory Judgment)

Sun Life sought a declaratory judgment that "each of the policies procured through the Imperial scheme lacked an insurable interest at its inception and should be declared void *ab initio*." SL SAC ¶ 402. The premise of the claim is that the policies owned by Imperial are unlawful in light of state law prohibiting the procurement of life insurance policies in which the beneficiary lacks an "insurable interest" in the insured individual at the time the policy is issued. *See* Fla Stat. § 627.404(1). The district court dismissed the claim under Rule 12(b)(6) and we affirm because Sun Life effectively conceded that its declaratory judgment claim is foreclosed under controlling Florida law by *Wells Fargo Bank, N.A. v. Pruco Life Insurance Co.*, 200 So.3d 1202 (Fla. 2016). *See* No. 17-10415 Reply Br. of Appellant at 2 n.2; *Pruco*, 200 So.3d at 1205–06 (concluding that policies procured in the precise manner in which Sun Life alleges Imperial procured its Sun Life policies here "have the insurable interest required by section 627.404," because the policies, "*at their inception*, benefitted individuals with insurable interests" (emphasis added)).

## III. IPF's Claims

As previously discussed, IPF's suit against Sun Life alleged in relevant part that Sun Life's efforts to challenge and undermine Imperial's ownership of the policies breached the policy agreements and was itself part of its own fraudulent

34

scheme.  The district court dismissed one theory of IPF's contract claim on the pleadings and dismissed the remainder of the contract claim and IPF's fraud claim at summary judgment.  We address each claim on appeal in turn.

### a.  Count II (Breach of Contract)

A breach of contract claim under Florida law requires the existence of a contract, the breach of the contract, and damages resulting from the breach.  *See DNA Sports Performance Lab, Inc. v. Club Atlantis Condo. Assoc., Inc.*, 219 So.3d 107, 109 (Fla. 3d DCA 2017).  IPF asserts that Sun Life's efforts to obstruct Imperial's ownership rights separately breached two provisions of the policy agreements: (i) the incontestability clause; and (ii) the rights-and-privileges clause.[22]

### i.  Alleged Breach of the Incontestability Clause

---

[22] Sun Life also contends that IPF lacks standing to bring its contract claim because it is not the record owner of any of the policies.  But, IPF sufficiently established, for purposes of defeating summary judgment, its standing to bring its contract claim given unrebutted evidence that the policy owners (each an Imperial subsidiary or affiliate, *see supra* at 21 n.11) orally assigned their causes of action to IPF.  *See* Dkt. 389-1; *see also W.S. Badcock Corp. v. Webb*, 699 So.2d 859, 861 (Fla. 5th DCA 1997) ("Contract rights that can be assigned include choses in action arising out of the parties' contract.  In fact, assignability of a cause of action is the rule rather than the exception." (internal citation omitted)); *Progressive Express Ins. Co. v. McGrath Cmty. Chiropractic*, 913 So.2d 1281, 1288 (DCA Fla. 2d 2005) (Davis, J., concurring) ("Except where a writing is required by statute, an assignment may be oral and proven by parol evidence.").  Sun Life contends on appeal that even if the policy owners did enter agreements to assign their causes of action to IPF, those agreements are invalid for failure to comply with the assignment procedures in the policy agreements. No. 17-10189 Br. of Appellee at 24–25.  But, Sun Life did not raise this contention in the district court, despite arguing on several occasions that IPF lacked standing to assert rights under the policies.  *See* No. 13-cv-80730, Dkt. No. 11 (S.D. Fla. Aug. 23, 2013); Dkt. 356 at 1; Dkt. 357 at 3–4; Dkt. 405 at 2–4.  We decline to address this argument for the first time on appeal.  *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

As relevant here, IPF contends that Sun Life's filing of its declaratory judgment claim was an untimely "contest[ing]" of the policy that consequently breached the incontestability clause.[23]   The district court dismissed this theory at the pleading stage, summarily concluding that the filing of a declaratory judgment claim cannot constitute a breach of contract.  Dkt. 441 at 5.  We disagree.

Unlike Sun Life's fraud-based claims, *see supra* at 21–25, Sun Life's claim for a declaratory judgment that the policies are void *ab initio* plainly "contest[ed]" the policies under controlling Florida law.  *See Pruco*, 200 So.3d at 1206–07; *Pruco Life Ins. Co. v. Wells Fargo Bank, N.A.*, 846 F.3d 1188, 1190 (11th Cir. 2017) (per curiam).  And, having filed its declaratory judgment claim more than two years after issuance of the policies, IPF has plausibly alleged that Sun Life breached the terms of the incontestability clause.

Sun Life nevertheless contends that IPF's claim for breach of the incontestability clause fails as a matter of law.  In this regard, we have already rejected Sun Life's arguments that:   (i) IPF lacks standing to enforce the incontestability clause, *see supra* at 35 n.22; (ii) the court must conduct a choice-of-law analysis prior to addressing the impact of the incontestability clause, *see supra* at 14–18; and (iii) a declaratory judgment claim is not a "contest" to the policies, *see supra* at 36.  Additionally, Sun Life raises the following arguments:

---

[23] To the extent IPF alleges that Sun Life breached the incontestability clause through its fraud-based claims, we disagree for the reasons stated *supra* at 19–25.

36

(i) its act of filing a declaratory judgment claim is protected by the absolute immunity afforded by Florida's litigation privilege; and (ii) a breach of an incontestability clause is not actionable for a damages suit under Florida law. We disagree with both contentions.

### 1.  Florida's Litigation Privilege

Sun Life contends that it cannot be sued for filing its declaratory judgment claim because its act of filing a lawsuit is absolutely immune from liability under Florida's litigation privilege. At its most basic level, Florida's litigation privilege "provid[es] legal immunity for actions that occur in judicial proceedings." *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So.2d 380, 383 (Fla. 2007). Because the filing of a lawsuit is an "action[] that occur[s] in [a] judicial proceeding," *id.*, Sun Life contends that its filing of its declaratory judgment claim is protected by the privilege. The district court ultimately disagreed. *See* Dkt. 293 at 24; *but see* Dkt. 267 at 32–33. We are in accord with the district court.

Florida adopted its litigation privilege to protect testifying witnesses against defamation suits premised on statements they made in open court. *See Myers v. Hodges*, 44 So. 357, 361–62 (Fla. 1907). The concern was with chilling robust courtroom testimony.  As the Florida Supreme Court stated in *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. United States Fire*

37

*Insurance Co.*, 639 So.2d 606 (Fla. 1994), the "absolute immunity [provided by Florida's litigation privilege] resulted from the balancing of two competing interests: the right of an individual to enjoy a reputation unimpaired by defamatory attacks versus the right of the public interest to a free and full disclosure of facts in the conduct of judicial proceedings." *Id.* at 608.

> The privilege reflects a policy judgment that in most cases participants in litigation must be free to engage in unhindered communication and to use their best judgment in prosecuting or defending a lawsuit without fear of civil liability notwithstanding the potential harm to an individual on the receiving end of a defamatory statement or other bad act.

*AGM Inv'rs., LLC v. Bus. Law Grp., P.A.*, 219 So.3d 920, 924 (Fla. 2d DCA 2017) (internal quotation marks omitted).

Although at its inception the privilege offered immunity only from actions sounding in defamation, *see Levin*, 639 So.2d at 607–08, the Florida Supreme Court has significantly expanded the privilege. In *Levin*, it extended the privilege to protect not just allegedly defamatory litigation conduct but any "tortious behavior . . . [which had] some relation to the [judicial] proceeding." *Id.* at 608. In *Echevarria*, the Court expanded the privilege beyond the tort context to hold immune from suit a party facing claims that its litigation conduct violated a statute:

> The litigation privilege applies across the board to actions in Florida, both to common-law causes of action, those initiated pursuant to a statute, or of some other origin. "Absolute immunity must be afforded to any act occurring during the

course of a judicial proceeding . . . so long as the act has some relation to the proceeding."

950 So.2d at 384 (quoting *Levin*, 639 So.2d at 608)).

*Echevarria*, however, is not the Court's latest word on Florida's litigation privilege. In *Debrincat v. Fischer*, 217 So.3d 68 (Fla. 2017), the Court receded somewhat from the broad language in *Echevarria*. There, Fischer filed a malicious prosecution suit against Debrincat alleging that Debrincat maliciously added Fischer as a party defendant in an earlier action. Debrincat asserted that the litigation privilege immunized his conduct of adding Fischer as a defendant in the earlier action, but the Florida Supreme Court disagreed. It concluded that the litigation privilege does not provide immunity from claims for malicious prosecution, principally because if it did so it "would eviscerate [that] long-established cause of action." *Debrincat*, 217 So.3d at 70.

After *Debrincat*, and despite the broad formulations in *Levin* and *Echevarria*, we do not think that the Florida Supreme Court is of the view that the litigation privilege offers *per se* immunity against any and all causes of action that arise out of conduct in judicial proceedings. *See id.* Rather, the applicability of the privilege must be assessed in light of the specific conduct for which the defendant seeks immunity. In this case, therefore, we must ask whether Florida's litigation privilege would immunize a defendant from a breach of contract claim where the

39

act that allegedly breached the contract was the filing of a lawsuit. We think it would not.

We are aware of no case applying a litigation privilege to provide immunity from a claim that the act of filing a lawsuit breached a contract. In fact, Sun Life points us to only one instance in which a Florida court has upheld application of the litigation privilege to extend immunity from a breach of contract claim generally. In *James v. Leigh*, 145 So.3d 1006 (Fla. 1st DCA 2014), Leigh sued James in relation to allegedly defamatory statements that James made in his earlier divorce proceeding. Leigh not only brought a claim for defamation, but also asserted that James' defamatory statements breached the parties' non-disparagement agreement. The Florida appellate court held that James was protected by the litigation privilege from facing suit on both the defamation and the breach of contract claims. In a straight-forward application of *Levin*, the court dismissed the defamation claim because the allegedly defamatory statements "had some relation to [James'] divorce proceeding." *Id.* at 1008. It then briefly addressed the breach of contract claim, which it dismissed because it refused to read the non-disparagement agreement as a waiver of the litigation privilege. *Id.* at 1008–09.

We do not think that *James*, or any other Florida authority, requires us to extend absolute immunity to the filing of a lawsuit where that specific act breaches

40

a contract. Although *James* allowed an immunity defense to defeat a breach of contract claim, the underlying conduct for which immunity was sought—in-court defamatory statements—went directly to the original purpose of the litigation privilege. Specifically, James' statements were made as part of a vigorous defense in his divorce proceeding and allowing such statements to be the object of a subsequent lawsuit (either for defamation or breach of contract) could have a serious "chilling effect." *James*, 145 So.3d at 1008 (quoting *Levin*, 639 So.2d at 608). In contrast, we do not think that applying the privilege here would meaningfully serve the aims of the privilege. To be sure, disallowing the litigation privilege where it would otherwise immunize the litigant from breach of contract suits might to some extent chill the "free and full disclosure of facts in the conduct of judicial proceedings." *Levin*, 639 So.2d at 608. But, the true source of any chilling effect will be the parties' duly-entered contract, which itself bars the filing of the lawsuit.

We are further persuaded by *Debrincat*, which made plain that the litigation privilege should not be applied in novel ways that serve to "eviscerate" long-standing sources of judicially available recovery. 217 So.3d at 70. There, the Court concluded that application of the privilege to provide immunity from malicious prosecution suits would effectively eliminate the malicious prosecution tort precisely because the first element of the tort is the filing of a lawsuit. *Id.*

41

Here too, application of the privilege would virtually extinguish a common form of relief: the awarding of damages for breaches of agreements not to sue a contract counterparty.   *See, e.g.*, *Glob. Commc'ns., Inc. v. Directv, Inc.*, 2015 WL 10960959, at *2 (N.D. Fla. Nov. 16, 2015); *Atlas One Fin. Grp., LLC v. Alarcon*, 2015 WL 1191211, at *6 (S.D. Fla. Mar. 16, 2015); *Foliar Nutrients, Inc. v. Plant Food Sys., Inc.*, 2014 WL 3510594, at *4 n.6 (M.D. Fla. July 14, 2014); *In re W.B Care Ctr., LLC*, 419 B.R. 62, 73 (Bankr. S.D. Fla. 2009); *Gregoire v. Lucent Techs., Inc.*, 2005 WL 1863429, at *3–4 (M.D. Fla. Aug. 5, 2005); *see also Hertz Corp. v. Hellens*, 140 So.2d 73, 75 (Fla. 2d DCA 1962).   In fact, Sun Life's position that a party may never face a breach of contract suit for its litigation activity would create perverse incentives that would undermine the "strong public policy favoring freedom of contract" that is "not [to be] lightly interfered with." *City of Largo v. AHF-Bay Fund, LLC*, 215 So.3d 10, 16 (Fla. 2017) (internal quotation marks omitted).   For example, a party could enter into a solemn agreement not to disclose certain sensitive information (*i.e.*, trade secrets or personal data), and the following day make the disclosure in a civil complaint without facing any liability.   Surely this does not align with the Florida Supreme Court's view of the litigation privilege.

Sun Life has failed to show that Florida's litigation privilege immunizes it from IPF's claim that Sun Life's suit breached the incontestability clause.

42

## 2. Actionability of a Breach of the Incontestability Clause

Apart from the litigation privilege, Sun Life contends that Florida law does not allow damages suits for the breach of an incontestability clause. The district court accepted the argument, concluding that the incontestability clause may be "raised [only] as a shield, not a sword." 2016 WL 10565034, at *3. We disagree.

It is a core principle, of course, that generally a contractual breach by one party entitles the counterparty to damages. *See Walter Int'l. Prods., Inc. v. Salinas*, 650 F.3d 1402, 1418 (11th Cir. 2011). Sun Life contends that when an incontestability clause is breached that basic rule does not apply, but its arguments are unpersuasive.

Sun Life relies on a line of Florida cases concluding that an incontestability clause is "in the nature of, and serves a similar purpose as, a statute of limitations." *Prescott*, 176 So. at 878. Because damages actions are not available in relation to an adversary's filing of an action outside of a statutory limitations period, the argument goes, so too are damages unavailable in relation to those filed outside a contractual contestable period. The argument's premise is hollow. In cases that have analogized an incontestability clause and a statute of limitation, the incontestability clause was invoked defensively, not offensively, and thus it indeed played a role similar to a statute of limitation. *See, e.g., id.* at 878–89. But, a limitations period and a contestable period are fundamentally different:  the first is

43

solely a creature of statute, violations of which do not generally entitle the aggrieved person to seek redress, and the second is found in a contractual term, a breach of which generally allows for a damages claim. And, unlike limitations periods, the Florida legislature mandates the inclusion of incontestability clauses in insurance contracts, *see* Fla. Stat. § 627.455, which strongly indicates that the legislature intended for damages to be available upon their breach. Otherwise, we see no reason why the legislature simply would not have directly prohibited untimely policy contests. *See Am. Nat'l Ins. Co. v. Schneider*, 2013 WL 1215608, at *3 (M.D. Fla. May 17, 2013) (holding that under Florida law an insured can sue insurer for breach of an incontestability provision).

Finally, Sun Life contends that an incontestability clause is akin to certain other contractual provisions that do not allow for a suit upon their breach. Sun Life provides as an example a provision in a commercial lease requiring the tenant to provide 90 days' notice if it wishes to elect its "option to renew" the lease, arguing that the "contest[ing]" of a life insurance policy after the contestability period is analogous to the tenant in its example providing only 45 days' notice of its election to renew. No. 17-10189 Br. of Appellee at 28. The comparison is specious. The incontestability clause here contains clear prohibitive language ("cannot contest") that the hypothetical lease ("option to renew") does not.

44

We conclude that an incontestability clause, like nearly all contractual prohibitions, may allow for damages upon its breach.  We therefore vacate the district court's dismissal of IPF's claim that Sun Life breached the incontestability clause.

### ii.  Alleged Breach of the Rights-and-Privileges Clause

As discussed previously, the policies at issue provide that the policy owner has "the sole and absolute power to exercise all rights and privileges under [the Policy] without the consent of any other person."  Dkt. 472-1 at 16.  IPF alleged that Sun Life violated this "rights-and-privileges clause" in various ways.  *See supra* at 10.  The district court dismissed the claim at summary judgment, concluding that IPF failed to sufficiently establish the damages element of this contract theory.  We agree.

Each of the harms IPF identifies on appeal relates to the effects of Sun Life's conduct on Imperial's ability to use the life insurance policies as collateral.  IPF focuses on a credit facility an Imperial affiliate entered into in April 2013, the proceeds of which were to be used by Imperial in part to pay life insurance premiums on its Sun Life policies.  Pursuant to the arrangement, Imperial pledged the 457 life insurance policies that it owned at the time as collateral for an up to $300 million loan that carried with it a favorable interest rate structure.  *See* Imperial Holdings, Inc., Annual Report (Form 10-K) (Mar. 10, 2014), 1–2, 26, F-

45

23, F-34–35; *see also* Dkt. 452-2 at 6–7.  Imperial contends that the 33 Sun Life policies it owned were expected to be included in that collateral pool but were excluded by the lender "as a consequence of Sun Life's actions in failing to fulfill its obligations related to those policies."  Dkt. 452-2 at 7.  Because the Sun Life policies could not be included in that credit facility, IPF contended, Imperial was required to seek alternative financing for its premium payments but could only do so on less favorable terms.  Imperial asserts that it therefore suffered "interest related" damages of $5 million.  *See* Dkt. 458 at 2–3.[24]  We think these asserted damages were insufficiently foreseeable for IPF's claim to survive summary judgment.

Under Florida law, "evidence as to the amount of damages cannot be based on speculation or conjecture, but must be proven with certainty."  *Caulkins Indiantown Citrus Co. v. Nevins Fruit Co.*, 831 So.2d 727, 734 (Fla. 4th DCA 2002).  "Whether damages are speculative must be determined by inquiry into both causation of the damage and measurement of damages. . . .  Proof must show with

---

[24] IPF also contends that it is entitled to loss-of-use damages in the amount of premium payments Imperial made to Sun Life.  *See* No. 17-10189 Reply Br. of Appellant at 19; *see also* Dkt. 452-2 at 12.  We disagree.  Loss-of-use damages are not available to recover "damages in excess of the amount which represents the loss actually inflicted by the action of the defendant."  *MCI Worldcom Network Servs., Inc. v. Mastec, Inc.*, 995 So.2d 221, 223 (Fla. 2008).  Unlike the typical loss-of-use scenario, Imperial did not lose the full use of the life insurance policies.  Indeed, Imperial still stands to receive the main fruit of the policies:  death benefits.  Rather, Imperial, at most, lost one tangential use of the life insurance policies, and one that, as we discuss, was not foreseeable.  To award the full measure of Imperial's premium payments would therefore "bestow a windfall" on Imperial.  *Id.* at 224.

reasonable certainty that the plaintiff suffered damages and that the damages flowed as the natural and proximate result of defendant's . . . conduct." *Aldon Indus., Inc. v. Don Myers & Assocs., Inc.*, 517 F.2d 188, 191 (5th Cir. 1975) (applying Florida law).  Consequently, a key inquiry in a breach of contract suit is whether a plaintiff's asserted "damages were reasonably foreseeable to [the defendant] at the time the contracts were made." *Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1317 (11th Cir. 2001) Where a plaintiff has failed to make this showing, "summary judgment is appropriate." *Id.* at 1318; *see also ProfiTel Grp., LLC v. PolyOne Corp.*, 238 F. App'x 444, 450 (11th Cir. 2007); *Gunster, Yoakley & Stewart, P.A. v. McAdam*, 965 So.2d 182, 184 (Fla. 4th DCA 2007); *Bothmann v. Harrington*, 458 So.2d 1163, 1170 (Fla. 3d DCA 1984).

IPF has not sufficiently established the foreseeability of its claimed damages for breach of the rights-and-privileges clause to withstand summary judgment. Significant to our foreseeability analysis are Sun Life's efforts, prior to issuing the policies subject to these disputes, to avoid having its policies enter the secondary market in the hands of investors.  Although Sun Life might have foreseen that a few of its policies might nevertheless wind up in the hands of third parties, or that some policy owners might seek to use the policies as collateral for discrete loan obligations (such as home mortgages), it had no reason to foresee that: (i) a large number of its policies would be transferred to the secondary market; (ii) a single

47

secondary market investor would collect a large number of those policies; (iii) that investor would then seek financing to pay the premiums on those policies, and, in so doing, would try to bundle those policies to serve as collateral supporting a more than quarter-billion dollar credit facility; (iv) the lender would refuse the policies as collateral in light of Sun Life's questioning of the validity of the investor's ownership of those policies; (v) the investor would then seek other outside financing to make the premium payments; and (vi) that outside financing would be more costly than that offered by the investor's credit facility.

We do not think this chain of events can conceivably be described as foreseeable to Sun Life at the time it issued the policies. We thus affirm the dismissal of IPF's claim that Sun Life breached the rights-and-privileges clause.

### b. Count IV (Fraud)

As we have discussed, a fraud claim under Florida law requires a showing of "an intentional material misrepresentation upon which the other party relies to his detriment." *Lance*, 457 So.2d at 1011. IPF's fraud claim proceeds on two theories: (i) Sun Life fraudulently misrepresented in the policy agreements that it would comply with the incontestability clause despite harboring a secret intent not to do so; and (ii) Sun Life fraudulently omitted from post-contract communications to Imperial its internal view that the policies were invalid and contestable and that Imperial was not their proper owner. The district court found no triable issue as to

48

either theory and therefore dismissed IPF's fraud claim at summary judgment. We agree.

First, we agree with the district court that IPF's "secret intent" theory of fraud is duplicative of IPF's breach of contract claim and therefore inactionable. Under Florida law, "[m]isrepresentations relating to the breaching party's performance of a contract do not give rise to any independent cause of action in tort, [where] such misrepresentations are interwoven and indistinct from the heart of the contractual agreement." *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1316 (11th Cir. 2007) (quoting *Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So.2d 74, 78 (Fla. 3d DCA 1997)); *see also Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So.3d 399, 408–09 (Fla. 2013) (Pariente, J., concurring).

IPF contends that this rule is no bar to its fraud claim, which, it argues, is independent from its breach of contract claim. In so arguing, IPF relies on cases that it contends permitted a fraud claim to proceed alongside a breach of contract claim where the plaintiff alleged that the defendant never intended, from the outset, to comply with the contractual provisions at issue. No. 17-10189 Br. of Appellant at 36–42 (relying principally on *Entron, Inc. v. General Cablevision of Palatka*, 435 F.2d 995 (5th Cir. 1970) and *Steak House, Inc. v. Barnett*, 65 So.2d 736 (Fla. 1953)). IPF's cited authority is inapposite. Those cases did not turn on a contract party's secret intent not to comply with a contractual provision. Rather, in each

49

case, the misrepresentation supporting the defendant's fraud claim was a *pre-contractual representation* made by the defendant to the plaintiff expressly affirming that it would comply with the specific contractual provision that it ultimately breached.

For example, in *Entron*, the relevant contract required the defendant to perform certain work within 60 days, which it did not do. The Fifth Circuit allowed a fraud claim to proceed not on the fact that the defendant harbored a secret intent not to comply with the 60-day requirement, but because of "repeated statements by [the] Vice President [prior to executing the contract] . . . that his company was strictly limited to the requirement that it have the job completed within sixty days." 435 F.3d at 998. Stated differently, the plaintiff was independently induced into entering the contract by the defendant's extra-contractual misrepresentations regarding its intent to comply with the 60-day provision. Similarly, in *Steak House*, the plaintiff alleged that the defendant had a secret intent never to perform under a contract *but also* that the defendant made "false and fraudulent statements and representations to plaintiff . . . to induce plaintiff to execute the agreement." 65 So. 2d at 737 (internal quotation marks omitted). And, *Steak House* relied on *Pryor v. Oak Ridge Development Corp.*, 119 So. 326 (Fla. 1928), which made clear that "[a]s a general rule fraud cannot be predicated on a mere promise not performed. . . . [T]o be available, *there must be*

50

*a false assertion in regard to some existing matter by which a party is induced.*" *Id.* at 328 (internal quotation marks omitted and emphasis added).

Here, IPF has not alleged that Sun Life made any representation, independent from the incontestability clause, that it would not challenge the validity of the policies after the contestable period. Because the only source of IPF's alleged inducement is the contract, this theory of IPF's fraud claim may not proceed.

Second, we reject IPF's theory that Sun Life made actionable misrepresentations in post-contract communications to Imperial. The statements on which IPF relies for this theory are notices sent by Sun Life stating that the policies were "in force," "in good standing," "active," or that the contestability period had expired. No. 17-10189 Br. of Appellant at 42. But, of course, IPF does not assert that those statements were untrue. Rather, its theory is that Sun Life did not believe those statements to be true and fraudulently *omitted* its subjective beliefs from its notices despite a duty to disclose them.

IPF's fraudulent omission theory cannot survive summary judgment. Even assuming *arguendo* that IPF sufficiently established that Sun Life omitted material facts in its post-contract correspondence that it had a duty to disclose to Imperial, it

51

is unclear what act IPF claims Sun Life induced by those alleged omissions.[25]

Perhaps IPF refers to Imperial's continued payment of policy premiums. *See* No. 13-cv-80730, Dkt. No. 1 ¶ 115 (S.D. Fla. July 29, 2013).  But, Imperial was contractually obligated to make those payments, and surely a counterparty's subjective belief that a contract is invalid, without any outward manifestation, is insufficient to constitute a repudiation that would excuse Imperial from that obligation.  *See Mori v. Matsushita Elec. Corp. of Am.*, 380 So.2d 461, 463 (Fla. 3d DCA 1980) (a repudiation of a contract excusing a counterparty's non-performance "must be distinct, unequivocal, and absolute").  IPF therefore has not shown that Sun Life's alleged omissions induced Imperial to do anything that it would not have otherwise done.

We affirm the district court's dismissal of IPF's fraud claim.

## IV.   Conclusion

For the reasons stated above, we hereby AFFIRM in part and VACATE in part the judgments entered by the district court.

As to Sun Life's complaint, we AFFIRM the district court's dismissal of Count V (fraud conspiracy) and Count VII (declaratory judgment); and we

---

[25] IPF identified no induced action in its briefs on appeal. *See* No. 17-10189 Br. of Appellant at 42–47; Reply Br. of Appellant at 22–23.  Nor did it appear to tell the district court.  In its brief presentation of its fraud by omission theory at the district court, the closest it came to asserting an induced act is contending that Sun Life's omissions "misled Imperial into believing that [Sun Life] intended to honor its obligations under the Policy when in fact the opposite was true."  Dkt. 471 at 18.  A fraud claim requires an induced and harmful *act*, not simply an induced belief uncoupled from a corresponding act that manifested in an identifiable harm.

VACATE the district court's dismissal of Count I (RICO), Count II (RICO conspiracy), Count III (fraud), Count IV (aiding and abetting fraud), and Count VI (tortious interference with contractual relations).

As to IPF's complaint, we AFFIRM the district court's dismissal of Count II (breach of contract) to the extent it asserts a breach of the rights-and-privileges clause, and Count IV (fraud); and we VACATE the district court's dismissal of Count II (breach of contract) to the extent it asserts a breach of the incontestability clause.

Both cases are REMANDED for further proceedings consistent with this opinion.

JORDAN, Circuit Judge, concurring.

I join Judge Walker's well-written opinion for the court, and add the following on Imperial's claim that Sun Life breached the incontestability provision in the policies.

As far as I can tell, only one court in the United States has addressed whether an insurer's declaratory judgment action against an insured to void a policy, in violation of an incontestability provision, gives rise to a breach of contract claim by the insured. *See American Nat'l Ins. Co. v. Schneider*, 2013 WL 12156086, *3 (M.D. Fla. 2013) (holding, under Florida law, that an insured can sue its insurer for breach of an incontestability provision). Despite this general absence of authority, I agree with the court that Imperial's breach of contract claim against Sun Life should proceed beyond the pleadings stage. As I explain, however, issues remain for the district court on remand with respect to this claim.

One leading insurance treatise posits that "an incontestability provision is designed to safeguard an insured from excessive litigation" after a certain period of time. *See* 17 Couch on Insurance 3d § 240:5 (2005). If this is so, there is a rough analogy to a contract not to sue (sometimes called a covenant not to sue). *See generally* Restatement (Second) of Contracts § 285(1) (1981) ("A contract not to sue is a contract under which the obligee of a duty promises never to sue the obligor or a third person to enforce the duty[.]").

54

In at least some jurisdictions, an action filed in violation of a contract not to sue may under certain circumstances—which vary by jurisdiction—permit a suit for breach, with the measure of damages usually being the attorney's fees and costs incurred in defending against the claim that was precluded. *See, e.g., Lubrizol Corp. v. Exxon Corp.*, 957 F.2d 1302, 1305-06 (5th Cir. 1997) (New York law); *Anchor Motor Freight, Inc. v. Int'l Bhd. of Teamsters et al.*, 700 F.2d 1067, 1072 (6th Cir. 1983) (federal law – labor relations); *Artvale, Inc. v. Rugby Fabrics Corp.*, 363 F.2d 1002, 1008 (2d Cir. 1966) (federal law – patent infringement – and/or New York law); *Borbely v. Nationwide Mut. Ins. Co.*, 547 F.Supp. 959, 977 (D.N.J. 1981) (New Jersey law); *Quill Co. v. A.T. Cross Co.*, 477 A.2d 939, 944 (R.I. 1984) (Rhode Island law); *Smith v. Garrett*, 29 Tex. 48, 52 (1867) (Texas law). Consistent with these authorities, one district court applying Florida law has ruled that the breach of a contract not to sue is actionable. *See Gregoire v. Lucent Technologies, Inc.*, 2005 WL 1863429, *4 (M.D. Fla. 2005) (citing, among other cases, the Sixth Circuit's decision in *Anchor Motor Freight*).

Admittedly, other jurisdictions take a different approach. They allow a defending party to seek attorney's fees and costs for breach of a contract not to sue as long as the contract expressly authorizes such recovery. *See, e.g., McKissick v. Yuen*, 618 F.3d 1177, 1191-92 (10th Cir. 2010) (Oklahoma law); *Bukuras v. Mueller Group, LLC*, 592 F.3d 255, 266-67 (1st Cir. 2010) (Massachusetts law);

55

*Convey Compliance Sys. Inc. v. 1099 Pro, Inc.*, 443 F.3d 327, 333-34 (4th Cir. 2006) (Minnesota law); *In re Weinschneider*, 395 F.3d 401, 404 (7th Cir. 2005) (Illinois law); *Astor v. IBM Corp.*, 7 F.3d 533, 540 (6th Cir. 1993) (federal law – ERISA).

Our holding today is that Imperial's breach of contract claim, which is based on the incontestability provision, is viable under Florida law. But we leave a number of related (and important) issues unanswered. On remand, the district court will need to figure out the scope of Imperial's breach of contract claim, including the appropriate measure of damages.

In Florida, the damages typically available in a breach of contract action are those causally related to the breach so long as they were contemplated by, or reasonably foreseeable to, the parties at the time they entered into the contract. *See Poinsette Dairy Products v. Wessel Co.*, 166 So. 306, 310 (Fla. 1936); *Capitol Env. Services, Inc. v. Earth Tech, Inc.*, 25 So.3d 593, 596 (Fla. 1st DCA 2009); *Mnemonics, Inc. v. Max Davis Associates, Inc.*, 808 So.2d 1278, 1279 (Fla. 5th DCA 2002); *Olin's, Inc. v. Avis Rental Car Sys. of Fla., Inc.*, 172 So.2d 250, 252 (Fla. 3d DCA 1965). Another formulation is that, "[g]enerally, a person or entity injured by either a breach of contract or by a wrongful or negligent act or omission of another is entitled to recover a fair and just compensation that commensurate with the resulting injury or damage." *MCI Worldcom Network Services, Inc. v.*

56

*Mastec, Inc.*, 995 So.2d 221, 223 (Fla. 2008). I am confident that the parties, at the appropriate time, will provide the district court with their views on the issue.

57